Per Curiam :
This case was referred to Trial Commissioner W. Ney Evans with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on August 3,1967. Defendant filed a notice of intention to except pursuant to Eule 59 which it subsequently withdrew on September 15,1967. No further action having been taken by the parties within the times as set forth pursuant to the Kules, the case now comes before the court on its own motion for action on the commissioner’s report. Since the court agrees with the commissioner’s findings, opinion, and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case without oral argument. Therefore, plaintiff is entitled to recover the amount by which the re *1097 tired pay be would bave received if be bad been retired from tbe Navy for permanent physical disability ratable at 30 percent under tbe Veterans Administration Code and 10 U.S.C. § 1210(c) exceeds tbe severance pay ($9,600) be bas received pursuant to 10 U.S.C. § 1210(e), and judgment is entered to tbat effect, witb determination of tbe amount of recovery reserved for further proceedings under Hule 47 (c).
OPINION OF COMMISSIONER*
Evans, Oommissioner:
Plaintiff seeks by this action to recover tbe difference between bis severance pay and tbe retired pay be would bave received if be bad been retired from tbe Navy for permanent physical disability ratable at least 30 percent under 10 U.S.C. § 1210 (c) instead of a rating which placed him under 10 U.S.C. § 1210(e), the severance pay section.
On tbe basis of tbe findings of fact (findings 1-19), tbe recapitulation (findings 20-24), tbe conclusions (findings 25-26), and tbe finding of ultimate fact (finding 27), it is my opinion tbat tbe plaintiff is entitled to recover.
Findings op Fact
1. (a) Plaintiff enlisted in tbe Navy on December 7,1940, when be was 18 years of age.[1] He served through continuous enlistments through March 31, 1959, a period of 18 years, 3 months, and 24 days.
(b) On April 1, 1959, bis name was placed on tbe Temporary Disability Betired List by reason of physical disability. His rate at the time was Chief Aviation Guided Missileman.
(c) On November 5, 1963, be was separated from tbe Service by honorable discharge witb severance pay, for physical disability.
(d) He seeks by this action to recover tbe difference between bis severance pay and the retired pay he would bave received if be had been retired for permanent physical dis *1098 ability ratable at least 80 percent under 10 U.S.C. § 1210(c)[2] instead of the severance pay section, 10 U.S.C. § 1210(e).[3]
2. (a) The illness from which plaintiff suffered was first noted early in January 1958. Upon admission to the dispensary in the Naval Air Station at Cecil Field, Florida, on January 13, 1958, symptoms were observed of a paranoid type of schizophrenic reaction, and he was immediately transferred to the Naval Hospital at Jacksonville.
(b) There he told the Chief of the Neuropsychiatric Unit that he believed his wife had been placing sodium pentathol in his coffee to obtain information from him and that she was doing so in concert with others. On the basis of this and other somewhat bizarre statements, and his demeanor of being withdrawn and preoccupied, the psychiatrist, on January 14,1958, diagnosed his condition as:
* * * schizophrenic reaction, paranoid type * * * acute, severe, manifested by ideas of reference, suspi-ciousness and delusional ideation; stress moderately severe with history of venereal disease in 1940’s; predisposition not evident; impairment severe.
(c) On January 16, 1958, plaintiff was transferred to the Oakland, California, Naval Hospital (known as Oak Knoll[4]), where he was admitted on January 20, 1958, and assigned to the neuropsychiatric unit. He remained there until April 15, 1958.
(d) During March of 1958, plaintiff met a woman who was serving as a Eed Cross volunteer. He first told her that he *1099 was in tbe hospital because of an incurable disease. When she later learned that he was a mental patient, he told her that he had had a nervous breakdown. Their attachment to each other increased and, in 1960, after plaintiff had been divorced from his first wife, they were married. She appears later in these findings as Mrs. Sharon Davis.
3. (a) During plaintiff’s stay at Oak Kinoll, his condition appeared to improve. Psychological testing on March 4,1958, found that he had an early paranoid reaction, minimal in degree. A psychiatric workup showed that he had experienced no psychopathic symptoms until he went on a NATO cruise during the summer and fall of 1957.
(b) A family history was secured. It revealed that plaintiff had come from a broken home: his mother and father were divorced, his mother had remarried, and plaintiff had lived with his maternal grandmother.
(c) On plaintiff’s return from the NATO cruise, “he became suspicious of his wife’s interest in him, ruminated over her fidelity in his absence and eventually developed a meticulous delusional system concerning his wife * :|: *.” The report from which the foregoing quotation was taken continued:
While in this hospital, the patient has shown improvement, especially concerning his delusion of his wife’s disloyalty. He participates in group meetings and eagerly seeks to discuss his problems with his doctor. He has been ward Master-At-Arms and has taken care of the recreational endeavors. He has visited with most of his relatives, most of whom are living on the West Coast. Until the end of January he enthusiastically tried to convince the doctor about his delusion; in the early part of February he was asking the doctor how to give it up; in the middle of February he talked less about his delusion and started examining his own personality and his wife’s personality. On one occasion he commented: “I could never completely trust anyone. I always checked the work done by the men under me without being noticed by them. I could never give myself completely to my wife. * * * My wife is also lacking in affection. * * * She wants to dominate the family and makes me feel left out of my family.” Towards the end of his hospitalization the patient began to make more realistic plans for the future. At the present time the patient shows evi *1100 dence of improvement and is highly motivated for continued Naval Service. It is recommended that he be sent to duty for a period of six months’ limited duty.
On 26 March 1958 the diagnosis was changed by reason of error to Paranoid State, Acute, Improved, #3016.
(d) The report of a Board of Medical Survey at Oak Knoll, dated March 31,1958, stated:
* * * On initial interview here the patient presented himself as a neatly-dressed, average-sized adult who was cooperative and talkative without any evidence of bizarre mannerisms or any emotional excitement. In general conversation he was noted to be intelligent and well oriented with orderly thought processes, good memory and judgment. However, when conversation centered about his family relationship, thought processes were disorganized and judgment became unrealistic. His delusions were limited to his relationship with his wife. There was suspiciousness concerning his wife. He utilized much projection and paranoid thinking.
Physical examination and neurological examination were within the limits of normal.
4. (a) The Board of Medical Survey found plaintiff fit for duty for a probable duration of 6 months and recommended that he be returned to limited duty within the continental limits of the United States. On April 15, 1958, the commanding officer recommended approval by the Chief, Bureau of Medicine and Surgery, and ordered plaintiff transferred to the Beceiving Station at Treasure Island (San Francisco) for temporary limited duty pending BuPers action.
(b) On April 29, 1958, however, the Chief of Medicine and Surgery modified the Board’s action by a recommendation that plaintiff be ordered to appear before a Physical Evaluation Board.
(c) On May 21, 1958, a Physical Evaluation Board recommended a finding that plaintiff “is physically fit to perform all the duties of his rate.” No action had been taken by the Physical Review Council on this recommendation when further developments occurred as next related.
*1101 (d) On July 8, 1958, plaintiff appeared at the Treasure Island dispensary as a self-referral, stating:
I deserve an explanation why they are putting amytal in my coffee. The Navy makes me sign papers under hypnosis.
(e) Following an immediate psychiatric interview, the examiner reported:
At present this man is quite paranoid, delusional and has no insight whatsoever as regards his problems. He is now available for assignment to duty as a guided missle-man [sic] and has secret clearance. It is this examiners [sic] opinion that this man is psychotic and at best unsuited for limited duty of a non classified nature.
Plaintiff was promptly returned to Oak Knoll for further treatment. On July 15, 1958, his condition was diagnosed as schizophrenic reaction, paranoid type, chronic, moderate.
(f) On July 23, 1958, while on liberty, plaintiff was a passenger in an automobile that was involved in an accident, as a result of which he suffered a simple fracture of the right acetabulum (hipbone). ITe was transferred to the orthopedic unit of the hospital where he remained for 2 months while the fracture healed. He was then returned to the neuropsychiatric unit.
5. On November 7, 1958, plaintiff again appeared before a Medical Board. On November 26,1958, this Board forwarded to the Physical Keview Council a lengthy addendum to its initial report of March 31,1958. Following are excerpts from the addendum:
Mental status examination on admission revealed the patient to be a tall medium built, well groomed young male.in no acute distress and apparently in good general physical health. During interview he was tense, hyper alert, and very talkative. Pie tended to ramble and was often circumstantial. There was marked loosening of associations with many vague and tangential replies to questions. He had great difficulty making direct answers. He made frequent irrelevant references to “sodium amytal,” to his previous psychiatric interviews, to his wife’s religion, and his relationship with her. He was often evasive and manifested much denial. He was sus *1102 picious and at times covertly hostile toward the examiner. His mood was garrulous, mildly grandiose and elated. He denied hallucinations. He manifested no disturbance of memory, was completely oriented and appeared to be of above average intelligence.
During his stay in the hospital the patient manifested a superficial improvement. He became much less tense and anxious and the pressure of speech was diminished. In normal conversation, his stream of thought has been relatively well organized but in a more stressful interview situation, the patient continued to manifest a loosening of associations and circumstantiality. In general, his relationship to the staff and other patients was cordial, although, at times he tended to become grandiose. While a patient on the Neuropsychiatric Service the patient, while on liberty, was injured in a motor car accident at about 1815 on 23 July 1958, at which time he was a passenger. He was rendered unconscious for approximately five minutes and then complained of pain in the right hip. The patient was transferred to the Orthopedic Service on 23 July 1958. X-ray examination at that time showed a partial central dislocation of the right acetabu-lum. He was subsequently retained on the Orthopedic Service for completion of treatment of the aforementioned injuries and on 20 September 1958, he was returned to the Neuropsychiatric Service. Therapy at this hospital had consisted of individual and group psychotherapy, occupational therapy, and group recreational activities.
While in the protective hospital environment the patient was able to achieve a superficial improvement. His symptoms of anxiety and tension diminished and his hyperactivity and overproductive speech also lessened. In stress-free situations he is able to maintain a fairly well organized stream of thought, however, in more stressful interview situations he still manifests symptoms of schizophrenia. He becomes distractible and somewhat suspicious. There is also noticeable loosening of associations. On close questioning he revealed a hard core of delusions centered around the supposed placement of “drugs” in his coffee and his wife’s supposed infidelity. The patient’s orthopedic treatment has been concluded. At the present time he is considered mentally able to be discharged into his own custody and if so discharged is not likely to become a public charge.
*1103 The symptoms at the present time are suspiciousness, delusional thinking, ideas of reference, grandiosity, loosening of associations, and circumstantiality.
8. (a) The foregoing report of the Medical Board was forwarded to a Physical Evaluation Board which, on January 13, 1959, entered findings (1) that plaintiff was unfit to perform the duties of his rate by reason of physical disability incurred while he was entitled to receive basic pay and (2) that the disability may be permanent. Its diagnosis was: schizophrenic reaction, paranoid type. This disability was rated at 30 percent under the Veterans Administration Code 9003.[5] There was an additional rating of 10 percent under Veterans Administration Code 5010 for arthritis due to. fracture of the right acetabulum.
(b) On April 1, 1959, plaintiff’s name was placed on the Temporary Disability Retired List, and he was relieved from active duty.
7. (a) Section 1210 of Title 10, United States Code, requires: in subsection (a), that a physical examination shall be given at least once every 18 months to each member whose name is on the Temporary Disability Retired List; in subsection (b), that the Secretary shall make a final determination upon the expiration of 5 years; in subsection (c), that if, as a result of either a periodic examination or a final examination, the member’s disability is determined to be of a permanent nature and is at least 30 percent under the VA schedule, the member shall be permanently retired; while in subsection (e), the provision is that if the disability is permanent but less than 30 percent, a member who has less than 20 years of service shall be separated and given severance pay.
(b) Veterans Administration Code 9203 relates to “schizophrenic reaction, paranoid type.” [6] It is one of 11 kinds of *1104 psychotic disorders listed in Codes 9200-9210, under which there appears the following:
General Bating Formula for psychotic Beactions:

Rating

Active psychotic manifestations of such extent, severity, depth, persistence or bizarreness as to produce complete social and industrial inadaptability_ 100
With lesser symptomatology such as to produce severe impairment of social and industrial adaptability- 70
Considerable impairment of social and industrial adaptability _ 50
Definite impairment of social and industrial adaptability _ 30
Slight impairment of social and industrial adaptability _ 10
Psychosis in full remission_ 0
(c) The foregoing Schedule for Bating Disabilities is preceded by an extensive text under the heading Mental Disorders from which the following are excerpts:[7]
Mental Disorders
§ 4.125 GENERAL CONSIDERATIONS.
The field of mental disorders represents the greatest possible variety of etiology, chronicity and disabling-effects, and requires differential consideration in these respects. These sections under mental disorders are concerned with the rating of psychiatric conditions and specifically psychotic, psychoneurotic and pyschophysiologic disorders, as well as mental disorders accompanying organic brain disease. Advances in modern psychiatry during and since World War II have been rapid and profound and have extended to the entire medical profession a better understanding of and deeper insight into the etiological factors, psychodynamics, and psychopath-ological changes which occur in mental disease and emotional disturbances. The psychiatric nomenclature employed is based upon the Diagnostic and Statistical Manual of Mental Disorders, 1952 Edition, American Psychiatric Association, and is incorporated in the Standard Nomenclature of Diseases and Operations, fourth edition, 1952, American Medical Association. This nomenclature has been adopted by the Department of Medicine and Surgery of the Veterans Administration. It limits itself to the classification of disturbances of mental functioning. To comply with the fundamental requirements for rating psychiatric conditions, it is im *1105 perative that rating personnel familiarize themselves thoroughly with this manual (American Psychiatric Association Manual, 1952 Edition) which will be hereinafter referred to as the APA manual.
§ 4.129 Social inadaptability.
Social integration is one of the best evidences of mental health and reflects the ability to establish (together with the desire to establish) healthy and effective interpersonal relationships. Poor contact with other human beings may be an index of emotional illness. However, in evaluating impairment resulting from the ratable psychiatric disorders, social inadaptability is to be evaluated only as it affects industrial adaptability. The principle of social and industrial inadaptability as the basic criterion for rating disability from the mental disorders contemplates those abnormalities of conduct, judgment, and emotional reactions which affect economic adjustment, i.e., which produce impairment of earning capacity.
§ 4.130 EVALUATION 03? PSYCHIATRIC DISABILITY.
The severity of disability is based upon actual symp-tomatology, as it affects social and industrial adaptability. Two of the most important determinants of disability are túne lost from gainful work and decrease in work efficiency. The rating board must not underevaluate the emotionally sick veteran with a good work record, nor must it overevaluate his condition on the basis of a poor work record not supported by the psychiatric disability picture. It is for this reason that great emphasis is placed upon the full report of the examiner, descriptive of actual symptomatology. The record of the history and complaints is only preliminary to the examination. The objective findings and the examiner’s analysis of the symp-tomatology are the essentials. His classification of the disease as “mild,” “moderate,” or “severe” is not determinative of the degree of disability, but the report and the analysis of the symptomatology and the full consideration of the whole history by the rating agency will be. In this connection, the degrees of psychiatric impairment outlined on page 49 of the APA manual are not for application. In evaluating disability from psychotic reactions it is necessary to consider, in addition to present symptomatology or its absence, the frequency, severity, and duration of previous psychotic periods, and the veteran’s capacity for adjustment during periods of remission. Repeated psychotic periods, without long remissions, may be expected to have a sustained effect upon *1106 employability until elapsed time in good remission and with good capacity for adjustment establishes the contrary. Ratings are to be assigned which represent the impairment of social and industrial adaptability based on all of the evidence of record. Evidence of material improvement in psychotic reactions disclosed by field examination or social survey should be utilized in determinations of competency, but the fact will be borne in mind that a person who has regained competency may still be unemployable, depending upon the level of his disability as shown by recent examinations and other evidence of record.
8. Shortly after plaintiff went on temporary disability retirement status, he obtained employment with the Systron-Donner Corporation in Concord, California. He did production work at first, but later shifted to work in the maintenance, repair, and calibration of electronic equipment. The latter work was of approximately the same type as he had performed while on active duty in the Navy. He remained at this employment, working a steady 5-day week (with some overtime), throughout the period he was on the Temporary Disability Eetired List (or until November 5,1963), and was still so employed at the time of the trial of this case (October 1966).
9. In the early part of 1960, plaintiff’s wife obtained a divorce. He remarried in February of that year. He and his second wife (Mrs. Sharon Davis) were compatible during the first 8 or 10 months of their marriage. Toward the end of 1960, however, Mrs. Davis noticed a change in plaintiff’s attitude toward her. He became emotionally withdrawn and seemed to lose all desire for affection. He told her he wanted to go to Mexico and be examined by a doctor there.[8] He also said that his former wife had had him hypnotized, that she had put sodium amytal in his coffee, and that she had made a deal with the Catholic Church in order to absolve herself from adultery. This second marriage ended in divorce (obtained by him) in August 1963.
10. On August 15, 1960, plaintiff entered the Naval Hospital at Oakland, California, for the first of his periodic *1107 physical examinations. After reviewing the report of the examining physician, the Medical Board concluded: Í »!•
2. History:
a. Since retirement patient has worked as an electronic technician with Ceptru Domes [sic] Corporation, supporting his wife and two children (his children live with Ms previous wife). Iiis adjustment to work and marriage has been adequate, but with additional stress his suspiciousness could become delusional and prevent his adjusting at all. He has not required medical treatment.
* * * * *
3. Physical Examination:
❖ * Hi ❖
b. Mental status revealed a young man with mild suspiciousness and dissatisfaction with his marital status. He brought a card reading, “Before operating, Bead your instruction manual” which suggests paranoid feeling that others will be responsible for “messing him up.”
* * * * $
6. Summary:
a. The patient’s condition at present as compared to the day of separation is as follows: Essentially unchanged. His paranoid suspiciousness is still evident and prevents other than his present adjustment — a guarded and protected one.
* * * * #
11. (a) A few months later (late 1960), Mrs. Davis, being alarmed by the apparent recurrence of her husband’s problems, sought the advice of a civilian psychiatrist. He rebuffed her, advising her to try to be less of a doctor and more of a wife.
(b) After another year (ithe latter part of 1961), Mrs. Davis sought the help of a Navy doctor at Oakland Naval Hospital and was referred by him to the social service unit of the hospital where she consulted with Mr. Joseph P. Con-cannon, a psychiatric social worker employed by the Navy.
(c) Meanwhile, plaintiff had reported to the hospital for his second periodic medical examination, which was given by Dr. J. E. Jacobson, a psychiatrist on the hospital staff. *1108 Thereafter, Mr. Concannon discussed the case with Dr. Jacobson and agreed that Mrs. Davis needed help. Mr. Concannon saw Mrs. Davis as an outpatient once a week during the following 18 months. He also endeavored to have plaintiff come to the clinic, but plaintiff refused to do so. Mr. Concannon spoke to plaintiff once by telephone, but never saw him. Plaintiff and Mrs. Davis separated in March 1962, and were divorced in August 1963. The divorce terminated Mrs. Davis’ eligibility for medical care at the Naval Hospital.
(d) The report of the Medical Board on plaintiff’s condition based upon his second periodic examination, dated February 5, 1962, noted both his continued employment at the same job and his continued complaints of marital discord:
* * * He has developed a lack of sexual interest and his marital adjustment is suffering. * * * The patient’s condition at present is somewhat improved as regards his paranoid suspiciousness. His marital adjustment is poor, probably as a result of continuing paranoid tendencies. * * * This patient is limited in that he has a history of a severe psychotic illness which requires a protected environment. * * *
12. (a) Plaintiff’s third medical examination (which proved to be the final one) was scheduled for August 1963. Mr. Concannon assured Mrs. Davis that he would make available to the Medical Board the information about plaintiff that had been obtained from her. He requested the secretary in charge of Physical Evaluation Board proceedings to advise him when plaintiff’s case came up. Thereafter, the date slipped his mind. He was on leave when the Medical Board met to consider the case. Mrs. Davis, meanwhile, had gone to Colorado on a visit and was away from June into September 1963.
(b) Plaintiff appeared before the Medical Board on August 12, 1963. That Board reported:
# Hf * * %
2. History:
a. Since retirement the patient has continued to work as an electronic technician with the Systron-Sonner [sic] Corporation and is satisfied with this employment. Mari *1109 tal discord resulted in a divorce which will be final this month. Recreational activities include social dancing and skin diving. * * *
3. Physical ExamAnation:
$ $ 3* $ $
b. Mental status revealed an alert, oriented and cooperative man who denied any delusional thinking, sus-piciousness or ideas of reference. He felt his marital problems had been resolved by divorce.
$ $ $ $ $
6. Summary:
a. The patient’s condition at present as compared to the day of separation is that he is considerably improved in regard to his suspiciousness and paranoid ideation. He has maintained steady employment with the same company since May 1959. He has made an effort to improve his social adjustment.
b. This patient is limited in that he has a history of psychotic illness but has made a good clinical remission. He has required no medication nor further treatment.
❖ * ❖ * *
(c) There is in evidence the discovery deposition of Lt. Jay H. Miller, Jr., (MC) USN, who was the examining physician of this Medical Board. He testified (1) that as of the date of the examination (August 12,1963) he had graduated from medical school in 1961, completed his internship in 1962, entered upon active duty with the Navy in July 1962, enrolled in a 4-month course in psychiatry at the Naval Hospital in Bethesda, and was then transferred to the Oakland Naval Hospital where he had, at the time of the examination, completed 8 months of ward experience; and (2) that as of the date of the deposition (September 16, 1965), he had no independent recollection whatever of either the plaintiff in this case or of having made the examination.
13. (a) On October 1, 1963, plaintiff appeared before a Physical Evaluation Board at Oakland Naval Hospital. He was represented by counsel and testified in his own behalf. In his testimony and through the statements of his attorney, plaintiff urged the PEB to find that he was fit for return to *1110 active duty.[9] He testified that he had been steadily employed since his name was placed on the Temporary Disability Retired List; that his (civilian) job was the same as the duties he had performed for the Navy while on active duty; and that he got along well with his coworkers, his friends, and his neighbors.
(b) The Physical Evaluation Board recommended that plaintiff be found unfit for duty by reason of the following disabilities, both of which were deemed to be permanent: paranoid state, acute; and fracture, simple, right acetab-ulum. Each of these disabilities was rated at zero under the Veterans Administration Schedules.[10]
(c) The recommendations of the Physical Evaluation Board were forwarded to the Physical Eeview Council in Washington, accompanied by the rebuttal statement of plaintiff’s counsel wherein the attorney pointed to plaintiff’s record of steady employment in a job commensurate with his rate and to the fact that plaintiff appeared to have resolved his home difficulties and to have developed normal and healthy relationships with others. Once more the attorney argued that plaintiff should be allowed to return to active duty.
14. (a) While the recommendations of the Physical Evaluation Board were pending before the Physical Eeview Council, Mrs. Sharon Davis, having returned from Colorado, learned that Mr. Concannon had not made known to either the Medical Board or the Physical Evaluation Board the information she had given to him about plaintiff. At Mr. *1111 Concaimon’s suggestion, Mrs. Davis wrote a letter to the Physical Beview Council, which was duly received by it.
(b) Mrs. Davis’ letter (dated October 9, 1963) follows:
I am Sharon S. Davis, divorced second wife of David and although I have no financial interest in the outcome of his case I am concerned for his sake and also that of his two children.
I met David in March of 1958 while he was hospitalized at Oak Knoll Naval Hospital, Oakland for the mental illness that resulted in his disability discharge from the Navy. Our friendship became more personal and he confided in me the nature of his, to him, “supposed” illness and the circumstances of his treatment.
The following statements are true.
He is able to work fulltime and is dissatisfied with his job. He mentioned this to me Sept. 28, 1963. He will not quit or express such dissatisfaction to his employer as he believes the Navy prevents him from obtaining a higher security clearance rating and thus he would not be hired by another firm. He is “fed up” — his term told [sic] me. He lives very secluded. He does not see any of our friends, does not correspond with or reply to his family. He writes his children very seldom and believes they have been “turned against” him by his first wife and that they regard him as “some kind of nut.” He states he does not wish to see his family as “they never stood up for me.” He tells me of feeling uncomfortable around people and especially women. He believes still: his first wife gave him drugs; she committed adultry w/ [sic] his best friend; he was under hypnosis at his home, the base and Oak Knoll. He says he would like to go to Mexico, be examined by a Communist doctor who would have no allegiance to the U.S. and the Navy and who thus would “tell me the truth about the drugs and hypnosis.”
He asked me on Sept. 23 of ’63 if I thought the “Navy was going to settle things” with him on the following Friday (when he appeared before the P.E. Board at Oak Knoll.) He is not concerned with money and is always preoccupied with the idea of being fold the “truth.” Whenever I ask what is the truth he brings up the drugs, hypnosis, drilling (at Oak Knoll while recovering from an auto accident & in traction) of his teeth (the Navy was looking for microfilm) and other such ideas he has. He believes the Catholic Church (first wife’s religion) knows “all the facts” and that there existed a ‘meal” between the Church, his wife and the *1112 Navy. This “deal” is too lengthly [sic] to explain but concerned immoral activities of his then wife. He wanted to be free from our marriage since he told me continually [when I get “old” all you have to do is go to the Navy and they’ll help you get everything in a divorce suit.] We had one scene when I started to leave after much of a tirade from him re the above and he broke down, cried, clutched me and kept repeating “I don’t know why I act the way I do — but please don’t leave me.”
There has been no change in his ideas or his unhappy attitude since our marriage was dissolved. On my arrival (9-63) back from a trip of some length we talked and I asked him how it felt to be free — he replied “Sharon, I haven’t been free since the Navy globbered [sic] me.”
I feel severance pay would be unjust after 18 years service. He believes if he is declared fit for duty this will be an admission by the Navy they were wrong in sending him to the hospital for treatment of a mental disorder. He would be agreeable to most any solution presented to him as “what the Navy wants to do.” Then “they’ll tell me the truth if I go along with them.” He also says he “should not upset the applecare as then they’ll lock me up.”
I feel he needs help. He will discuss these matters only with me since he says I know the whole story. Yet he knows I do not believe everything he says and always qualifies his statements with “I can’t be 100% wrong.”
I fear he is on the verge of a complete collapse due to the way of life he has been leading. He does not trust his fellow employees but “can not pin anything or anyone down why.”
Thank you for your consideration of this matter. If I can be of aid please contact me.
15. (a) On October 17,1963, the Physical [Review Council concurred in the findings of the Physical Evaluation Board and recommended that plaintiff be removed from the Temporary Disability Eetired List and that he be separated from the Service for physical disability with severance pay.
(b) The foregoing recommendation was approved on the following day (October 18,1963) on behalf of the Secretary of the Navy by the Judge Advocate General.
(c) On November 5, 1963, plaintiff was honorably discharged from the Navy[11] with severance pay of $9,600.[12]
*1113 (d) Although plaintiff filed no reply to defendant’s contingent counterclaim demanding ref und (offset) of the $9,600 in severance pay if plaintiff is entitled as a matter of law to recover, concession was made at the trial that the offset should be made against plaintiff’s recovery if such recovery is ordered.
16. (a) While the present action was pending[13] and after pretrial submissions had been made and plaintiff had taken the discovery deposition of Lieutenant Miller,[14] further proceedings were suspended by mutual consent of the parties to permit plaintiff to file an application with the Board for Correction of Naval Records for the correction of his record. The application, filed February 11,1966, sought correction of his record to show that he had been retired for disability rated at 30 percent.
(b) The application was accompanied by a statement prepared by plaintiff’s attorney wherein the attorney argued (1) that the determination of the last Medical Board (August 12,1963) was incomplete because the Board had no social history of plaintiff before it; (2) that plaintiff’s hearing before the Physical Evaluation Board had been unjust because plaintiff was permitted to testify and his (then) counsel was permitted to argue that plaintiff should 'be returned to duty; (3) that reception of such testimony and argument in the face of Navy policy prohibiting the return to duty of members with psychotic histories caused the plaintiff fruitlessly to minimize his condition; and (4) that the failure of the Physical Review Council to consider the letter from Mrs. (Sharon) Davis as foundation for a new hearing was error.
(c) In support of his application plaintiff submitted to the Correction Board all of his naval records and the following documents:
(1) A letter, dated April 28, 1965, from Dr. Malcom A. Sowers, a San Francisco psychiatrist, to plaintiff’s attorney *1114 wherein Dr. Sowers expressed the opinion[15] that the Navy had correctly diagnosed plaintiff’s illness as paranoid schizophrenia ; that plaintiff “appears to have made a fair recovery and adjustment now and seems to be living within his limitations * * and concluded:
In conclusion: This man was discharged from the military service because of clear cut schizophrenic symptoms. He is making a fairly good adjustment now, utilizing the same characteristic mechanisms of not looking too deeply at things that he has always used. Circumstances could develop where he would have a relapse. The prognosis is somewhat guarded because it is so difficult for this man to admit even the past psychotic difficulties that he would be likely to let a relapse go too long before he would seek psychiatric treatment. I would anticipate that a fairly florid psychotic illness could develop before he would be forced to get help. It is possible that there would have been more continuing psychological manifestations of his illness had he not had a line of work which is so highly needed now in the civilian life relative to the military effort. The fact that he has been an electronic specialist in a field of work with which he was fairly familiar in the service has undoubtly [sic] been a major factor in helping him to make a superficially good adjustment now. * * *
(2) A report of psychological evaluation of plaintiff by Dr. Frank Politzer, a clinical psychologist, who reported findings that plaintiff had a—
* * * fundamentally schizoid personality makeup, and an array of repressive defenses. This combination of trends would suggest episodes of acting out, when his defenses are momentarily weakened and fear and hostility pour through the breach. There is no indication of any current psychotic process, yet a few indications of latent disturbances appear, which cannot quite be ignored.. When these are taken into account, the net impression is of a pseudo-schizophrenic psychopathy.
(3) An excerpt from the deposition of Lieutenant Miller[16] to the effect that if the information contained in Mrs. Davis’ *1115 letter[17] bad been available to him at the time of his August 1963 examination, it might have placed some doubt upon plaintiff’s good clinical remission.
17. (a) On March 3, 1966, the Board for Correction of [Records referred its file of plaintiff’s case to the Physical Disability [Review Board for an advisory opinion. The Review Board reported, on May 6, 1966, that in its opinion plaintiff’s disability had been properly diagnosed and evaluated by the Physical Evaluation Board on October 1, 1963, in accordance with accepted medical principles, based upon the evidence that was before it. The Review Board acknowledged that “a possible injustice was incurred by the petitioner in the Physical Review Council’s action of considering the letter from Mrs. Sharon S. Davis of 9 October 1963 as a rebuttal to the findings of the Physical Evaluation Board rather than treating the same as new evidence and returning the case for further evaluation by the Physical Evaluation Board”; but concluded (1) that if the contents of that letter had been so considered, they would not have been sufficient to have caused plaintiff’s disability to be rated at more than 10 percent ; and (2) that with such complete records, the interests of both the plaintiff and the Government were so well protected that a formal hearing was unnecessary.
(b) The opinion of the Review Board was forwarded by the Correction Board to plaintiff’s attorney to afford him an opportunity to file a rebuttal. By way of rebuttal, plaintiff’s attorney sent to the Correction Board a report by Dr. Joseph Catton, a psychiatrist who had been treating plaintiff since May 21,1964, and who, in the course of treatment, had also interviewed Mrs. Sharon Davis.
(c) Dr. Catton’s report stated, in substance;
(1) That plaintiff continuously said that he wanted to know the truth, and insisted that he was not suffering from a mental illness.
(2) That the disease (assuming that plaintiff did suffer from paranoid schizophrenia) is continuously present and is per se an incapacitating illness, even though its manifestations are below the surface.
*1116 (3) That in. bis opinion, occupational adjustment might be one test for disability but that he did not think that occupational adjustment alone should be conclusive; in his view, the fact that plaintiff had worked steadily should not preclude a finding that he is disabled.
(4) That plaintiff was apprehensive about his present and future employment.
(5) That in his (Dr. Catton’s) opinion, there was no remission whatsoever in plaintiff’s inability to understand and accept the opinions of the Navy psychiatrists and Boards, as well as those of his former wives, about his mental condition.
(6) That he (Dr. Catton), employing the standards promulgated in the Diagnostic Manual of the American Psychiatric Association, would classify plaintiff’s incapacity somewhere between the category of “moderate impairment” (“a degree of impairment which seriously, but not totally, interferes with the patient’s ability to carry on his pre-illness social and vocational adjustment, such as a 30 to 50 percent disability”) and that of “severe impairment” (“a degree of impairment which for practical purposes prevents a patient from functioning at his pre-illness social and vocational levels — over 50 percent disability”).
18. (a) The Correction Board sent its file (including plaintiff’s rebuttal) to the Bureau of Medicine and Surgery to obtain the advice of the Surgeon General on the issues before the Board. On July 14,1966, the Chief of the Bureau of Medicine and Surgery reported (1) that a review of the entire evidence showed that plaintiff was unfit for duty in 1963, and (2) that the only issue outstanding was the proper rating of plaintiff’s disability under the Veterans Administration Schedule. Noting that while a social history of plaintiff might have been valuable at the time of his discharge, the report stated that Dr. Catton, who had had the benefit of such a history, had not presented information which would alter the rating given to plaintiff enough to affect the disposition of the case. In this connection, the report continued:
There were, no doubt, residuals of the mental condition with which petitioner is afflicted. These residuals, per se, are more influencing on petitioner’s social vice industrial adaptability and such fact is ivell-supported by evidence of petitioner’s continued employment sub *1117 sequent to separation. Comparison of the standards with those symptoms or signs of impairment presented by petitioner clearly and unequivocably do not meet the standards for a rating of SO per cent. They may meet the requirements of a 10 per cent rating but are more appropriately classified under the zero per cent rating. Notwithstanding, resolving reasonable doubt in petitioner’s favor, a 10 per cent rating could have been assigned but to correct the record in such a manner is trivial in nature in that the benefits resulting from such a correction would be nil.
(b)By letter dated August 22,1966, the Executive Secretary of the Board for Correction of Naval Records notified plaintiff that the Board had denied his application for correction of his record.
19. (a) At the trial of the case, in San Francisco, in October 1966, plaintiff testified in his own behalf and called as witnesses Mr. Concannon, Mrs. Sharon Davis, and Dr. Catton.
(b) The substance of Dr. Catton’s testimony is contained in the summary of the report to plaintiff’s attorney, submitted by the attorney to the Correction Board, as set forth herein in finding 17(c).[18]
(c) The substance of Mrs. Davis’ testimony is contained in the letter she wrote to the Physical Review Council on October 9,1963, as set forth in finding 14(b). In addition, Mrs. Davis’ testimony refuted, as of subsequent periods, the encouraging reports of remission and readjustment presented to the Physical Evaluation Board (of October 1, 1963) by the Medical Board (of August 12, 1963), and by plaintiff and his then counsel. She also referred to plaintiff’s determination to go along with whatever the Navy might suggest rather than, in plaintiff’s words, “to make waves.”
(d) Mr. Concannon’s testimony confirmed the narrative given by Mrs. Davis in her letter to the Physical Review Council in relation to their joint failure to get before the *1118 Medical Board and tbe Physical Evaluation Board the information concerning plaintiff which Mrs. Davis had given to Mr. Concannon. He further testified that Dr. Jacobson (who was the medical examiner in plaintiff’s second periodic examination and who advised Mr. Concannon that Mrs. Davis needed help) [19] expressed the opinion (as a consequence of his examination of plaintiff) that “ * * * this man was sitting on a keg of dynamite * * * that his paranoia was so severe that he may take drastic action.”
(e) Plaintiff, himself, in personal appearance, was much as described in the Navy reports quoted in these findings: “ * * * a neatly-dressed, average-sized adult who was cooperative and talkative without any evidence of bizarre mannerisms or any emotional excitement * * * intelligent and well oriented with orderly thought processes * * *;[20] * * * in no acute distress and apparently in good general physical health * * * and appeared to be of above average intelligence * * [21]
His demeanor, however, and indeed his testimony, were such as to emphasize the possibility if not the probability that he was holding a grip on himself, determined not “to make waves” or otherwise to disturb the protective environment he had found in his current situation.
(f) With respect to his employment, plaintiff testified that he had been in the same job for V years and that he felt (at the time of trial) that he was not making as much money as he could with his present talent, adding “* * * but—I don’t know. When I first started my job, I had the usual ideas of progressing. But nowadays I go in at 8 and I quit at 4:30, and that’s it. And why I have this lackadaisical attitude, I don’t know.” He further testified:
Q. Have you ever applied for any other job?
A. No. I applied once at Livermore, and I think once at Aerojet General.
Q. Was it expected that those jobs would pay more than you are earning at Systron-Donner ?
A. Yes.
*1119 Q. Did you, in applying for the jobs, advise the prospective employer of your history of mental illness? '
A. Yes. '
Q. Did you hear anything in response to either application?
A. No.
RECAPITULATION
20. (a) In January 1958, upon the first manifestation of mental illness, plaintiff was hospitalized and his symptoms were diagnosed as schizophrenia, paranoid type. After 15 months of intermittent hospitalization, he was, on April 1, 1959, placed on the Temporary Disability Eetired List.
(b) Shortly thereafter, he obtained employment in the production of electronic equipment, but soon shifted (within the same company) to work in the maintenance, repair, and calibration of electronic equipment, which was comparable to the work he had performed for the Navy. He has continued in this work and was so employed at the time of trial. Meanwhile, two applications for positions elsewhere, in efforts to improve his job status, went unanswered. In each application he had reported his record of mental illness.
(c) Within less than a year after he was placed on the Temporary Disability Eetired List, plaintiff’s first wife divorced him, and he promptly remarried. Just at the time of his third (and final) periodic examination (August 1963), plaintiff divorced his second wife.
(d) Plaintiff was continued on the Temporary Disability Eetired List after his first periodic examination (August 1960) and his second periodic examination (February 1962). The psychiatrist who served as medical examiner for the second periodic examination considered plaintiff’s condition to be quite serious (“* * * his paranoia was so severe that he may take drastic action”).
(e) At the time of his third (and final) periodic examination, the medical examiner was a young man with 1 year of psychiatric training and experience combined. The examination of plaintiff was to him so routine, so much a part of the day’s work, that 2 years later the examiner had no recollection either of plaintiff as a patient or of having made the examination.
*1120 (f) Following the foregoing examination (in August 1963), plaintiff went before a Physical Evaluation Board (in October 1963), with counsel, in a designed effort to obtain a zero rating of disability, in the belief (mistaken, even at the time, although unknown either to plaintiff or his then attorney) that a zero rating of disability would lead to his restoration to active duty. Plaintiff’s desire for restoration to active duty was itself a part of his schizophrenic-paranoid delusion.
21. (a) The Physical Evaluation Board (of October 1963) accommodated plaintiff in his desire for a zero rating of disability, but found him unfit for duty nevertheless.[22]
(b) On October 17, 1963, the- Physical Eeview Council concurred in the findings of the Physical Evaluation Board,[23] and recommended that plaintiff be separated for physical disability with severance pay.
(c) This recommendation was approved on October 18, 1963, and plaintiff was honorably discharged from the Navy on November 5, 1963, with severance pay of $9,600.
22. (a) In October 1965, after the filing of the present action, proceedings were by agreement suspended to permit plaintiff to apply to the Board for Correction of Naval Bec-ords for correction of his record. The application was filed on February 11, 1966, seeking correction to show that plaintiff had been retired for physical disability rated at 30 percent.
(b) The application was accompanied by a statement prepared by plaintiff’s attorney to which were attached letters from two psychiatrists and a psychologist, and an excerpt from the deposition of the medical examiner of August 1963.
(c) The Correction Board, in search of advisory opinions, referred its file (1) to the Physical Disability Eeview Board and (2) to the Navy’s Bureau of Medicine and Surgery.
*1121 (d) The Review Board acknowledged the possibility of injustice resulting from the Review Council’s treatment of the letter from Mrs. Davis as rebuttal, but found that plaintiff’s disability had been properly diagnosed and evaluated, in accordance with accepted medical principles, by the Physical Evaluation Board, based upon the evidence that was before it;[24] wherefore, the Review Board concluded, the error (if any) of the Physical Review Council was de minimis, since the record as amplified by Mrs. Davis’ letter would not warrant a disability rating of more than 10 percent.
(e) Before forwarding the file to the Bureau of Medicine and Surgery, the Correction Board afforded plaintiff opportunity to file rebuttal to the report of the Review Board. Plaintiff’s attorney did so,[25] in the form of the report by Dr. Catton.
(f) The Chief of the Bureau of Medicine and Surgery, with the amplified file before him, found (1) that plaintiff was unfit for duty in 1963 and (2) that the only unresolved issue was the proper rating of plaintiff’s disability under the Veterans Administration Schedule. As to such rating he advised the Correction Board that the file would not support a correction of the record to show more than a 10-percent rating, and that “* * * to correct the record in such a manner is trivial * * * in that the benefits resulting from such a correction would be nil.”
(g) The Correction Board thereupon denied plaintiff’s application without a hearing.
23. (a) Under a list of psychotic disorders (schizophrenic reaction, paranoid type being Code 9203, situated between Codes 9200 and 9211), the Veterans Administration Schedule sets forth a “general rating formula for psychotic reactions” among which, in inverse order, are:
Psychosis in full remission 0
Slight impairment of social and industrial adaptability 10
Definite impairment of social and industrial adaptability 30
Considerable impairment, etc. 50
* * * Severe impairment * * * 70
* * * Complete inadaptability 100
*1122 (b) Extensive directions for evaluation of mental disorders are set forth in the Veterans Administration Schedule, excerpts from which are set forth in finding 7(c). Reference is made in the opening text to the adoption of “the psychiatric nomenclature * * * [of the] American Psychiatric Association * * *.” The evidence in the present case makes clear a differentiation in application, as between the American Psychiatric Association and the Veterans Administration, of rating disability because of social inadaptability, on the one hand, and industrial adaptability, on the other. Whereas the American Psychiatric Association recognizes and applies rating formulas for social inadaptability, the Veterans Administration specifically provides that “* * * the degrees of psychiatric impairment outlined on page 49 of the APA manual are not for application.” Instead, the VA requires that “the severity of disability is based upon actual symptomatology, as it affects social and industrial adaptability.” [Emphasis supplied.] Further explanatory clauses follow:
* * * Social integration is one of the best evidences of mental health * * *. Poor contacts with other human beings may be an index of emotional illness. However, in evaluating impairment resulting from ratable psychiatric disorders, social inadaptability is to be evaluated only as it afects industrial adaptability. The principle of social and industrial inadaptability as the basic criterion for rating disability from the mental disorders contemplates those abnormalities of conduct, judgment, and emotional reactions which affect economic adjustment, i.e., which produce impairment of earning capacity.
* * * Ratings are to be assigned which represent the impairment of social and industrial adaptability based on all of the evidence of record. [Emphasis supplied.]
24. (a) The crucial issue of law in this case is whether the action of the Correction Board, in denying plaintiff a hearing and in declining to correct his record, was arbitrary, capricious, unsupported by substantial evidence, or contrary to law.
(b) If the action of the Correction Board fails to withstand any one of these tests, there will remain the crucial issue of fact as to the degree of plaintiff’s impairment, if any, in *1123 terms of industrial impairment, at the time of separation, based on all the evidence of record.
CONCLUSIONS
25. (a) The finding by the Physical Evaluation Board that plaintiff was unfit for duty by reason of physical disability ratable at zero percent was unsupported by substantial evidence.[26]
(b) Both the Physical Disability Review Board and the Chief of the Bureau of Medicine and Surgery, in their reports to the Correction Board, tacitly admitted that the record would not support a zero rating of plaintiff’s disability.
(c) In accepting the conclusions put forward by the Physical Disability Review Board and the Chief of the Bureau of Medicine and Surgery that the error of the Physical Evaluation Board was de minimis, and in refusing plaintiff a hearing (thereby implicitly adopting the de minimis conclusions), the Correction Board abdicated its functions. Its action was therefore arbitrary and contrary to law.
26. (a) Plaintiff enlisted in the Navy at age 18. His age at the time of his separation was 41. During the 18 years intervening between his enlistment and his separation by temporary disability retirement, he acquired training and experience over a period of unspecified duration in the maintenance, repair, and calibration of electronic equipment.
(b) Judicial notice is taken of the economic potential of training and experience in the field of electronics, in the early 1960’s, for a man in his early 40’s who is above average in intelligence.
(c) In the course of his hospitalization, prior to his temporary disability retirement status, the hospital reports showed:[27]
* * * During liis stay in the hospital the patient manifested a superficial improvement. He became less tense and anxious * * *.
* * * "While in the protective hospital environment the patient was able to achieve a superficial improvement. * * *
*1124 (d) After his temporary disability retirement, a Medical Board reported (in August 1960) :[28]
* * * The patient’s condition at present as compared to the day of separation [i.e., retirement] is as follows: Essentially unchanged. His paranoid suspiciousness is still evident and prevents other than his present adjustment — a guarded and protected one.
At the time of that report, plaintiff was in civilian employment, engaged in the maintenance, repair, and calibration of electronic equipment.
(e) The Medical Board which reported on plaintiff’s second periodic examination said:
* * * The patient is limited in that he has a history of severe psychotic illness which requires a protected environment.
At the time of that report (February 1962), plaintiff remained in his civilian employment, doing the same work as before.
(f) The third (and final) Medical Board (August 1963) noted that:
* * * He [plaintiff] has maintained steady employment with the same company since May 1959. * * * * * * This patient is limited in that he has a history of psychotic illness but has made a good clinical remission. * * *
None of the examining physicians or Medical Boards made mention (indeed, they may not have known) of plaintiff’s unavailing efforts to improve his job status by seeking employment elsewhere. These efforts were frustrated (1) by his history of mental illness and (2) by his consequent inability to obtain clearance for secret work.
(g) The inferences are inescapable from “all the evidence of record”[29] (1) that plaintiff found, in his employment by the Systron-Donner Corporation and in the work of maintaining, repairing, and calibrating electronic equipment, a protective environment comparable to that which he had enjoyed in the Navy and (2) that he was restricted to this environment by the history and continuing course of his *1125 mental illness, wherefore, in this sense, his industrial adaptability was impaired.[30]
FINDING OF ULTIMATE FACT
27. At the time of plaintiff’s separation from the service, in November 1963, his mental illness imposed upon him a definite impairment of social and industrial adaptability.
Conclusion of Law
Upon the foregoing findings of fact and memorandum opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover the amount by which the retired pay he would have received if he had been retired from the Navy for permanent physical disability ratable at 30 percent under the Veterans Administration Code and 10 U.S.C. § 1210(c) exceeds the severance pay ($9,600) he has received pursuant to 10 U.S.C. § 1210 (e), and judgment is entered to that effect. The determination of the amount of recovery is reserved for further proceedings under Buie 47(c).

The memorandum opinion, findings of fact, and recommended conclusion of law are submitted under tbe order of reference and Rule 57(a).

 He was born on January 1,1922, in Oregon.

 10 U.S.C. § 1210(c) (1964) provides: “(c) If, as a result of a periodic examination under subsection (a), or upon a final determination under subsection (b), it is determined that the member’s physical disability is of a permanent nature and is at least 30 percent under the standard schedule of rating disabilities in use by the Veterans’ Administration at the time of the determination, his name shall be removed from the temporary disability retired list and he shall be retired under section 1201 or 1204 of this title, whichever applies.”

 10 U.S.C. § 1210(e) (1964) provides: “(e) If, as a result of a periodic examination under subsection (a), or upon a final determination under subsection (b), it is determined that the member’s physical disability is less than 30 percent under the standard schedule of rating disabilities in use by the Veterans’ Administration at the time of the determination, and if he has less than 20 years of service computed under section 1208 of this title, his name shall be removed from the temporary disability retired list and he may be separated under section 1203 or 1206 of this title, whichever applies.”

 Oak Knoll was one of two major facilities maintained by the Navy for the observation and treatment of mental disorders.

 Code 9003 was the number carried in the report of the Physical Evaluation Board. As hereafter noted the Code number as of 1964 was (and continues to be) 9203.

 38 CFR § 4.132, Schedule of Ratings, Mental Disorders.

 38 CFR § 4.125-4.130.

 Plaintiff expressed the belief that a Communist doctor might tell him the truth, which he believed to be withheld from him by the Navy.

 Section 1210 (f) of Title 10. United States Code, provides that if, as a result of a periodic (or the final) examination, it is determined that the member is physically fit to perform the duties of his grade, he shall be returned to active duty. Plaintiff’s counsel was evidently unaware of the Navy policy of refusing to return to active duty any member known to have suffered from a severe mental disorder. Watson v. United States, 152 Ct. Cl. 273 (1961).
Plaintiff’s sincerity in the effort to be returned to active duty is unchallenged. One is left to wonder whether, in the back of his mind, was a desire to complete another 1% years of service to make him eligible for 20-year retirement under 10 U.S.C. § 1210(d), if a recurrence of his illness should occur. Whatever his unrevealed motives, he is quoted in the record as desiring restoration to active duty in the hope that the Navy would admit that he did not have and never had had a mental illness and would then tell him the truth about the drugs and the hypnosis.

 Reference to the rating schedule quoted in finding 7 (b) shows that a zero rating for schizophrenic reaction, paranoid type, was tantamount to a finding of psychosis in full remission.

 Pursuant to 10 U.S.C. § 1210 (e).

 Computed under 10 U.S.C. § 1212.

 The petition was filed on November 23, 1964. In It plaintiff alleged that his discharge “was arbitrary, capricious and unlawful, and contrary to regulations pertaining thereto, and was made and executed without authority and was a breach of contract between plaintiff and defendant * * Defendant’s answer denied the essential allegations of the petition.

 Finding 12(c).

 Dr. Sowers reviewed (and related) plaintiff’s history which he obtained from the Navy medical records. He reported that he had examined plaintiff on one occasion and had consulted with plaintiff’s former wife and with a psychohvgist who had also examined plaintiff.

 Finding 12(c).

 Finding 14(b).

 It is pertinent to mention here that Dr. Catton, in addition to his professional qualifications and experience in the field of psychiatry, is a veteran expert witness in his field and evinces on the witness stand an aggressive, colorful personality through the use of techniques developed in long years of teaching. (The relevance of this comment rests upon the relation to this case of the court’s decision in Beckham v. United States, 179 Ct. Cl. 539, 375 F. 2d 782 (1967).

 Finding 11(c).

 Finding 3(d).

 Finding 5.

 While there is, as defendant points out, no specific evidence in the present record of Navy policy in regarding as physically unfit servicemen with histories of severe psychotic episodes, the matter is fully related in Watson v. United States, supra; and there is in the present record no other explanation of the finding of unfitness coupled with a zero rating of disability.

 The Physical Eeview Council had before it the account of plaintiff's illness supplied by Mrs. Sharon Davis.

 Emphasis supplied.

 Finding 17 (c).

 Implicit in this determination was a finding that plaintiff’s psychosis was in full remission. The evidence of record simply will not support such a finding.

 Binding 5.

 Finding 10.

 Finding 24(b).

 There is ample, specific evidence in the record of the' impairment of his social adaptability.