**Lula A. McGLASSON**

v.

**The UNITED STATES.**

No. 186–61.

United States Court of Claims.
June 14, 1968.

Skelton and Durfee, JJ., dissented.

---

John I. Heise, Jr., Washington, D. C., attorney of record, for plaintiff.

Edgar H. Twine, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, SKELTON, and NICHOLS, Judges.

## OPINION

COWEN, Chief Judge, LARAMORE, Judge, and DAVIS, Judge, delivered the following opinion and announced the judgment of the court:*

This case was referred to former Trial Commissioner Paul H. McMurray, pursuant to the order of reference and Rule 57(a), with directions to make findings of fact and recommendations for conclusion of law. The commissioner did so in an opinion and report filed on February 28, 1967. Exceptions to the commissioner's opinion and report were filed by plaintiff and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since we are in agreement with the opinion, findings, and recommendation of the commissioner, as we have modified them, we adopt the same as modified as the basis for our concurrence in the judg-

ment that the plaintiff is not entitled to recover and that the petition is dismissed.

Commissioner McMurray's opinion, as we have modified it, is as follows:

Plaintiff brings this action to recover back pay accruing during the period of time in which she was allegedly unlawfully separated from her classified civil service position. She must be denied recovery because the action of the Civil Service Commission was based upon substantial evidence and no material procedural errors are involved.

Plaintiff, a veteran, is a preference eligible under the Veterans' Preference Act of 1944, 58 Stat. 387, as amended, 5 U.S.C. §§ 851–869 (1964). She commenced her Federal service on March 13, 1942. On April 18, 1951, she began employment with the United States Air Force Accounting and Finance Center (hereafter Finance Center), and was a GS–3 clerk-typist at the time of her separation. Early in 1959 the Finance Center filed with the CSC an application for plaintiff's disability retirement.

Dr. Tish, Chief of the CSC Disability Retirement Section, Medical Division, informed plaintiff that the medical officers of the CSC felt that she was "totally disabled for useful and efficient service as a clerk-typist,"[1] and that her case would be adjudicated on the available evidence in her record file, including any evidence presented by her within a specified time. After receiving a request for a hearing from plaintiff's attorney, Dr. Tish informed plaintiff that no decision had been reached in her case but she would be given a psychiatric examination. His letter informed her that a determination would be made following the examination and receipt of the psychiatrist's report. Plaintiff was told that there was no need for a hearing but she

---

*The concurring opinion of NICHOLS, Judge, and the dissenting opinion of SKELTON, Judge, in which DURFEE, Judge, joins, follow this opinion.

1. This quotation is from one of defendant's exhibits attached to its motion for summary judgment. These exhibits were not introduced into evidence at the trial, but neither party objects to the court's consideration of these exhibits as part of the trial record.

had a right to appeal from an unfavorable decision.

Dr. Tish made arrangements for plaintiff to be examined in Denver, Colorado. He sent an Authorization for Medical Examination, CSC Form 3135 (hereafter Form 3135), to the Veterans Administration Regional Office in Denver. The form was used to authorize a medical examination of plaintiff for consideration in connection with possible Civil Service disability retirement. Form 3135 listed plaintiff's position, gave her birthdate, stated that the application was filed against her wishes, and described her disability as "Schizophrenic reaction, Paranoid type."[2] Form 3135 directed that a general medical examination and a neuropsychiatric examination of plaintiff be accomplished. The following paragraph was printed on Form 3135:

Please report your findings, diagnosis, and conclusion on the accompanying medical report form, and conclude your report of examination by stating whether the above person IS or IS NOT totally disabled for useful and efficient service in the position above noted, and whether or not the disabilities found are due to venereal disease, alcoholism, or any vicious habits. Your reasons for a conclusion of "total" disability should be fully stated.

Dr. Tish and medical officers under his supervision evaluate all disability retirement claims initiated with respect to employees in the Federal service and use their own judgment as to the type and extent of examinations required and the information deemed necessary for a proper determination.

Plaintiff reported, as directed, to the Veterans Administration Hospital on May 1, 1959, and a nurse's aide, Mrs. Montano, recorded plaintiff's weight, height and other measurements. A Dr. Masten performed a general medical examination of plaintiff. A psychiatrist, Dr. Lewis C. Overholt, performed an examination of plaintiff which consisted of a neurological examination and a psychiatric examination.[3] Dr. Overholt recommended psychological testing which was later conducted by a psychologist.

Prior to his examination of plaintiff Dr. Overholt had no information concerning plaintiff other than the data listed on Form 3135. When Dr. Overholt made his report the only additional information concerning plaintiff were his notes taken during the examination. Before the data concerning plaintiff was sent to the CSC, Dr. Overholt saw the report of the psychologist, but did not alter his report. Dr. Overholt's report consisted of two pages divided into sections entitled "History," "Neurological Examination" and "Mental Status." His diagnoses were as follows:

Schizophrenic reaction, chronic, undifferentiated type, in partial remission. External precipitating stress, and predisposition not determined at this examination. Impairment, severe. Competent.[4]

On the day he examined plaintiff Dr. Masten prepared a report on CSC Form 3178, Report of Medical Examination for Civil Service Retirement (hereafter Form 3178), for the primary purpose of recording the report of a general medical examination. Instructions on this form were:

The examiner will please make full report on each complaint or disability that is alleged or found on examina-

2. Dr. Tish testified that this was "merely a guide to the psychiatrist as to what was the alleged condition", and that is what it clearly appears to be.

3. By order the Court of Claims denied a motion for summary judgment and directed "further proceedings on the single question of whether or not the plaintiff had a medical examination by Dr. Lewis C. Overholt, Jr., and, if so, any diagnosis resulting therefrom." Later a motion to expand the scope of the commissioner's report was granted by the court, subject to presentation of "such further evidence as may be considered necessary" by both parties.

4. Dr. Tish testified that the word "Competent" "only means that she is competent to handle, to function. That is all we are interested in from the standpoint of the annuity funds that we pay her."

tion. If total disability for useful and efficient service is established, please show when such total disability began. See also instructions on Form 3135.

Near the end of Form 3178 is space for the medical examiner's conclusion. Prior to the time the data was reviewed by the CSC some individual, identity unknown, typed the following statement in the space provided:

> Patient is totally disabled.
>
> Disabilities are not due to venereal disease, alcoholism or vicious habits.

Neither Dr. Masten nor Dr. Overholt is responsible for that conclusion, and there is no evidence in the record which indicates to whom such responsibility can be attributed. Dr. Masten recorded nothing pertaining to plaintiff's psychiatric condition, but referred to Dr. Overholt's report. Dr. Masten's only diagnosis after conducting a physical examination of plaintiff was halitosis. It should be noted that the unexplained statement typed on Form 3178 is phrased in terms of the directive paragraph at the bottom of the form.

The data gathered by the hospital was sent to the Disability Retirement Section of the CSC and was reviewed by Dr. Tish and another doctor in accordance with usual procedure. Dr. Tish testified that each doctor independently concluded that plaintiff was "totally disabled for useful and efficient service" as a clerk-typist because of a "nervous disorder * * * schizophrenia." Despite the fact that the medical officers had various reports before them and that at least one of them assumed that the conclusion on Form 3178 was Dr. Masten's response to the directions on Forms 3178 and 3135, their determination or conclusion of disability was not, as explained below, influenced by the statement on Form 3178. They regard the determination of disability for retirement purposes to be the sole responsibility of the CSC and not that of the examining doctors.

Neither the psychologist's report nor the diagnosis of the psychiatrist, Dr. Overholt, were conclusive with respect to determination of disability because Dr. Tish and medical officers in his section look to the substance or detail in such reports when evaluating disability retirement claims. In view of the undisputed testimony of Dr. Tish that no more information than the title "clerk-typist" was required in order to evaluate plaintiff's suitability for the particular position, one can conclude that a more detailed description was not necessary.

When plaintiff was informed of the decision to retire her, she appealed, and Dr. Tish reviewed the determination of disability retirement arrived at in his division. Another reviewer considered the case after the review by Dr. Tish, and the case was then submitted to the Board of Appeals and Review of the CSC which affirmed the proposed involuntary disability retirement. In due course plaintiff was retired on an annuity.

■ Plaintiff does not attack and, as the discussion below on the scope of judicial review indicates, probably cannot successfully attack the substance of the psychiatric report on which the CSC based its determination. Plaintiff's contentions may be summarized as follows: (1) the CSC improperly denied plaintiff a hearing; (2) the motives of the Finance Center tainted the entire procedure; (3) the CSC violated a regulation requiring that the examining doctors be furnished certain information; (4) directions listed on Form 3135 were violated; (5) the mysterious statement in the conclusion space on Form 3178 prejudiced plaintiff; and (6) Dr. Tish could not properly review his own decision. These contentions will be discussed in the above order. First, however, it is appropriate to recognize that the scope of review in cases of involuntary disability retirement is limited by the Civil Service Retirement Act § 16 (c), 70 Stat. 758 (1956); 5 U.S.C. § 2266(c) (1964):

> Questions of dependency and disability * * * shall be determined by the Commission and its decisions

with respect to such matters shall be final and conclusive and shall not be subject to review. * * *

In applying that provision this court has followed decisions of the United States Court of Appeals for the District of Columbia Circuit, stating in Gaines v. United States, 158 Ct.Cl. 497, 501–502 (1962), cert. denied, 371 U.S. 936, 83 S.Ct. 309, 9 L.Ed.2d 271 (1964), as follows:

> * * * it is clear that the scope of judicial review in connection with a disability retirement is very narrow. The Civil Service Retirement Act empowers the Commission to administer the retirement provisions and to issue the necessary and proper rules and regulations (5 U.S.C. § 2266); the Act also provides that questions of disability "shall be determined by the Commission and its decisions with respect to such matters shall be final and conclusive and shall not be subject to review" (5 U.S.C. § 2266(c)). The Court of Appeals for the District of Columbia Circuit has already indicated the limited nature of possible court scrutiny in disability retirement cases. Ellmore v. Brucker, [99 U.S. App.D.C. 1], 236 F.2d 734, 736–737, cert. denied, 352 U.S. 955, [77 S.Ct. 329, 1 L.Ed.2d 244]; Murphy v. Wilson, [99 U.S.App.D.C. 4], 236 F.2d 737; Smith v. Dulles, [99 U.S.App.D. C. 6], 236 F.2d 739, 740, 742, cert. denied, 352 U.S. 955, [77 S.Ct. 329, 1 L. Ed.2d 244]. At most, a court can set the Commission's determination aside (or refuse to recognize it as valid) only where there has been a substantial departure from important procedural rights, a misconstruction of the governing legislation, or some like error "going to the heart of the administrative determination."

Errors alleged by plaintiff fall short of the standards for reversal on judicial review.

■ The Finance Center had statutory authority to file application with the CSC requesting plaintiff's retirement on the ground of disability. 41 Stat. 614 (1920), as amended, 5 U.S.C. § 2257(a) (1964). The CSC obviously processed the application as one for involuntary retirement on disability. Plaintiff contends that she should have been granted a hearing by the CSC. There is no statute or regulation providing a right to a hearing in disability retirement cases. The rule is clear that removal proceedings arising under the Retirement Act need not comply with the procedural requirements of the Veterans' Preference Act of 1944 and the Lloyd-LaFollette Act. Kleinfelter v. United States, 318 F.2d 929, 932, 162 Ct.Cl. 88, 93–94 (1963).[5] This court's denial of a motion for summary judgment coupled with an order directing trial on the limited issue of Dr. Overholt's examination indicates that it has reached the same conclusion.

■■ Plaintiff's brief discusses the motivation of the Finance Center in filing the application. There is nothing to show that the CSC acted in bad faith; accordingly, good faith is presumed. Knotts v. United States, 121 F.Supp. 630, 128 Ct.Cl. 489 (1954). The motives of the Finance Center are immaterial to the action of the CSC. Smith v. Dulles, 99 U.S. App.D.C. 6, 236 F.2d 739, 741 (1956), cert. denied, 352 U.S. 955, 77 S.Ct. 329, 1 L.Ed.2d 244. The court's order remanding this case to the commissioner after denial of the motion for summary judgment would seem to foreclose this issue since plaintiff had forcefully presented it to the court in pursuance of the summary motion.

5. The court cited Ellmore v. Brucker, 99 U.S.App.D.C. 1, 236 F.2d 734 (1956), cert. denied, 352 U.S. 955, 77 S.Ct. 329, 1 L.Ed.2d 244; and Murphy v. Wilson, 99 U.S.App.D.C. 4, 236 F.2d 737 (1956), cert. denied, 352 U.S. 954, 77 S.Ct. 326, 1 L.Ed.2d 243. In addition to *Kleinfelter*, supra, see Smith v. Dulles, 99 U.S.App. D.C. 6, 236 F.2d 739, 740 (1956), cert. denied, 352 U.S. 955, 77 S.Ct. 329, 1 L. Ed.2d 244, which dealt with the issue of the employee's right to a hearing.

■ Plaintiff contends that Dr. Overholt should have been furnished background information by the CSC. She points to a CSC regulation (21 Fed.Reg. 8262, 8263–8264 (1956), 5 C.F.R. § 29.12 (a) (4) (1961)):

Where the nature of the disability is reported to be a mental condition or other condition of such a nature that a prudent physican would hesitate to inform an individual found to be suffering from such a condition of its exact nature and probable outcome, a complete summary of the medical evidence in his case, including copy of the resume of the reported behavior irregularities or manifestations of unsatisfactory service *which is ordinarily furnished as background factual evidence to government medical facilities or psychiatrists or other physicians who conduct the official retirement medical examination,* ·shall be made available for review only by a duly licensed physician designated in writing for that purpose by the individual concerned. [Emphasis supplied.]

This paragraph is one of 13 paragraphs dealing with the circumstances and procedures under which records and documents may be disclosed to interested persons.

Plaintiff relies on the emphasized portion of the above-quoted provision to sustain her contention and cites several Supreme Court decisions to support the proposition that permissive language in a regulation should be given mandatory interpretation when warranted by the context. The Supreme Court in Farmers' & Merchants' Bank of Monroe, N. C. v. Federal Reserve Bank of Richmond Va., 262 U.S. 649, 662–663, 43 S.Ct. 651, 656, 67 L.Ed. 1157 (1923) stated "that is where the context, or the subject-matter, compels such construction." Clearly the context of the phrase on which plaintiff relies compels the conclusion that the phrase is permissive, if not merely descriptive of customary practice. Plaintiff could prevail if the public interest or an individual right called for a mandatory construction. Supervisors

v. United States, 71 U.S. (4 Wall.) 435, 18 L.Ed. 419 (1866). Plaintiff says the value of such background information is apparent, and thus seems to contend that an examination made, reported or evaluated without the benefit of such information is insufficient on which to base a proper determination of the degree of disability. Medical officers in the retirement division of the CSC use their own judgment with respect to the nature and extent of the examination and information on which to base their determination; they do not interpret § 29.12(a) (4) as plaintiff does.

It is not the function of this court to prescribe the nature or extent of information which the CSC will furnish examining doctors in order to assist them in making the required medical examination and report.

■ The CSC is "authorized and directed * * * to make such rules and regulations as may be necessary and proper" to administer the Retirement Act. Civil Service Retirement Act § 16(a), 70 Stat. 758 (1956), 5 U.S.C. § 2266(a) (1964). Plaintiff contends that the paragraph of directions in Form 3135 must be complied with or the entire process is invalid. The language of that paragraph is in the form of a request to non-Civil-Service-Commission personnel. That fact in itself need not be determinative. See discussion from Greenway v. United States, 175 Ct.Cl. 350, cert. denied, 385 U.S. 881, 87 S.Ct. 167, 17 L.Ed.2d 108 (1966) which provides the answer, stating in footnote 5:

* * * Nor is there any indication that the contents thereof [a handbook] were ever promulgated in the form of a regulation. Informal memoranda or documents of this kind seemingly directed only to internal management do not confer substantive rights on employees to recover lost salary whenever some suggestion or working rule contained therein is not observed by a supervisor. DeBusk v. United States, 132 Ct.Cl. 790, 795–796 (1955), cert. denied, 350 U.S. 988,

[76 S.Ct. 474, 100 L.Ed. 854] (1956). Even a deviation from a formal regulation does not vest rights in third parties when the regulation is issued merely for the guidance of certain agency personnel. Centex Construction Co. v. United States, 162 Ct.Cl. 211 (1963).

The *Centex* case, ibid., held that plaintiff lacked standing to attack contract regulations designed for the benefit of the Government. The disputed language in Form 3135 is not a regulation. Even if it were a regulation, by its terms it is directed to the data-gathering process and not to procedural rights conferred upon plaintiff. The object of the clause in Form 3135 is to solicit an opinion as to whether or not plaintiff is totally disabled. Such opinion is relatively unimportant to the decision of the CSC because the CSC regards itself as alone having the authority to make a determination of disability; and it may not be argued that Dr. Overholt could determine whether plaintiff was subject to retirement. 70 Stat. 758 (1956), 5 U.S. C. § 2266(c) (1964). If the failure to comply with the clause is in error, it is a harmless and nonprejudicial error. Spector v. United States, 165 Ct.Cl. 33 (1964), cert. denied, 379 U.S. 966, 85 S.Ct. 659, 13 L.Ed.2d 560 (1965); Putschoegl v. United States, 165 Ct.Cl. 65 (1964).

Plaintiff cites several cases to sustain a contention that the clause on Form 3135 is binding on the CSC. In each case cited an administrative authority promulgated the material in issue for the purpose of providing the individual with certain rights or benefits. In Daub v. United States, 292 F.2d 895, 154 Ct. Cl. 434 (1961), the court dealt with a table of penalities contained in a regulation. The table itself was suggestive and not binding or conclusive. The regulation required that penalties be applied in accordance with the spirit of fairness expressed therein. The court held that the spirit of fairness was violated by the actual penalty imposed so as to constitute a "gross misapplication of the reg-ulation." Id. at 437, 292 F.2d at 897. There is no analogous situation here requiring a mandatory construction of the clause in question.

A decision based on arbitrary or capricious evidence may well be an arbitrary or capricious decision. The statement in the conclusion space on Form 3178 is obviously an arbitrary statement if it was not merely a clerical error. Had such statement been accepted by the CSC, thereby influencing the administrative determination, the decision to retire plaintiff would not stand. The statement, however, was completely immaterial to the decision. As such, it was not harmful to plaintiff's cause. *Spector,* supra, and *Putschoegl,* supra. See *Gaines,* supra; and *Knotts,* supra. In the particular context, the egregious error in typing in the "conclusion" did not affect the determination by the CSC of plaintiff's case. In particular, it is significant that this "conclusion" appeared only on the report of Dr. Masten, who was not a psychiatrist, did not purport to give plaintiff a psychiatric examination, and found her only physical defect to be halitosis. Dr. Tish did not consider this "conclusion" a psychiatric evaluation and paid no attention to it.

■ A review of the evidence in the record, including the full reports of Dr. Overholt, the psychiatrist, and Dr. Herring, the psychologist, as well as other material before the CSC, shows that there was substantial evidence to support the CSC's determination that plaintiff was totally disabled. Also Dr. Tish's testimony, read as a whole, shows that he considered the substance and details of these reports, together with the other materials before him, and that the CSC performed the duty entrusted to it. In the light of the narrow limits on our power to review that determination, we cannot say that there was any error in evaluating that evidence "going to the heart of the administrative determination." See Scroggins v. United States, Ct.Cl., 397 F.2d 295 decided this day.

Plaintiff contends that lack of data regarding the position of clerk-typist

precluded the CSC from fairly judging her suitability for the job. In view of the testimony of Dr. Tish that this particular position could be evaluated without detailed knowledge of plaintiff's duties, it cannot be said that such evaluation was arbitrary or capricious or that plaintiff was in any way prejudiced. This issue is, therefore, subject to the same disposition as the contention that the statement in the conclusion space on Form 3178 affected the disability determination.

Plaintiff's last contention is that Dr. Tish should not be permitted to review his own decision of total disability. Had Dr. Tish been the only person reviewing his decision or had the final decision rested with him, there might be merit to such contention. The case was merely resubmitted to him to give him an opportunity to review the decision before it was considered by the Board of Appeals and Review of CSC for final administrative action.

For the foregoing reasons plaintiff is not entitled to recover [6] and the petition should be dismissed.

NICHOLS, Judge, concurring.

I agree that the plaintiff in this action ought not to recover and that the petition must be dismissed. I think plaintiff failed to sustain her burden of proof. I am unable to join with a plurality of the court in adopting the commissioner's detailed Findings and Opinion modified as its own. In light of the dissatisfaction stated by our dissenters, I would have joined in reopening the record to include relevant material not now found therein.

At the risk of seeming to labor the obvious, I think it is important to begin by noting that the Civil Service Commission's action here under review subjects the plaintiff to involuntary retirement under authority of 5 U.S.C. § 2257(a), because of psychiatric disability. We are not referred in this case to published standards of what constitutes such disability. Psychiatric disability I suppose does not necessarily mean that the person is insane, has a mental deficiency or defect, needs to be placed in an institution for his own or others' safety, or is incapable of managing his own property and funds. There are conditions short of any of these which are due to psychiatric causes, or are believed to be, and which render the afflicted individual in ordinary speech "unemployable", that is, incapable of rendering useful service on the assigned job in a large organization such as a Federal department is. For the CSC, as its notices to plaintiff made clear, unemployability is disability and what the latter word may mean in any other context is irrelevant. This is natural in an organization concerned with persons in their employment relation with the Government, not their private lives.

Most Federal agencies do not maintain periodic psychiatric checks on their employees, though some are said to do so. In the former category of agencies a condition of psychiatric disability normally comes to be suspected because of contemptuous and insubordinate behavior, inability to make decisions or complete work assignments, or other forms of conspicuous unhelpfulness on the job. Frequently, though not invariably, the employee who is suspected of being psychiatrically disabled will passionately and bitterly oppose any suggestion that he retire voluntarily. Frequently, too, in such cases, the behavior evidencing psychiatric disability also displays inefficiency or a violation of agency rules, making it

---

**6.** Having concluded that plaintiff's contentions lack merit there is no need to discuss defendant's contention that plaintiff failed to show she was ready, willing and able to resume her duties. This defense focuses on her ability to perform her work and relies on Dr. Overholt's report as evidence of inability. Plaintiff offered no evidence to show she had ability, but some of the exhibits attached to her brief opposing defendant's motion for summary judgment bear on this point. Defendant first raised this issue late in the trial by way of an offer of proof which was refused.

possible to obtain the employee's separation on ordinary charges. As an example, see the litigation reported as Seebach v. United States, 182 Ct.Cl. 342 (1968); and Seebach v. Cullen, 224 F.Supp. 15 (N.D.Cal.1963), aff'd 338 F.2d 663 (C. A. 9, 1964), cert. denied 380 U.S. 972, 85 S.Ct. 1331, 14 L.Ed.2d 268 (1965). If the agency elects to act by way of disability retirement it is due to an unwillingness to turn a person it deems unemployable out on the street without means of support. Disability retirement carries with it a modest pension. In view of the difficulties likely to be caused by the employee, an agency choice of this course of action would appear, *prima facie*, at least, a high-minded one, if quixotic.

Even in connection with employee actions less obviously motivated for the employee's welfare, we have held that there is a strong presumption that official actions are taken in good faith and that the proof of bad faith in such a situation "requires especially strong evidence." Gibson v. United States, 176 Ct. Cl. 102, 109 (1966); Keener v. United States, 165 Ct.Cl. 334, 339 (1964); Knotts v. United States, 121 F.Supp. 630, 128 Ct.Cl. 489, 492 (1954). In Knotts we said at p. 492, 121 F.Supp. at 631:

\* \* \* \* \* \*

Personnel disputes are hard to resolve. In undertaking to do so, we start out with the presumption that the official acted in good faith. We are always loath to find to the contrary, and it takes, and should take, well-nigh irrefragable proof to induce us to do so. \* \* \*

\* \* \* \* \* \*

"Irrefragable" means, "impossible to gainsay, deny, or refute," per Webster's Third International Dictionary.

There is finality language in the statute involved, which is, that the question of disability, "shall be determined by the Commission and its decision with respect to such matters shall be final and conclusive and shall not be subject to review." (5 U.S.C. § 2266(c)). We have held that the extent of judicial review in disability retirement cases is limited and confined to "a substantial departure from important procedural rights, a misconstruction of the governing legislation, or some like error 'going to the heart of the administrative determination.'" Gaines v. United States, 158 Ct.Cl. 497, 502, cert. denied 371 U.S. 936, 83 S.Ct. 309, 9 L.Ed.2d 271 (1962). Accord, Cerrano v. Fleishman, 339 F.2d 929, 931 (2d Cir. 1964), cert. denied, 382 U.S. 855, 86 S.Ct. 106, 15 L.Ed.2d 93 (1965). In *Cerrano,* supra, the court said at p. 931 of 339 F.2d:

\* \* \* \* \* \*

\* \* \* The evidential matter used and the Commission's method of receiving it, as well as the conclusions reached, were clearly within the area of its exclusive authority and cannot be disturbed. \* \* \*

This case originally came before us on cross-motions for summary judgment and as I understand it, the defendant's motion would have been allowed, except for a factual dispute put forward by the plaintiff as to whether a Dr. Overholt, a psychiatrist, shown to have examined and diagnosed her in the administrative record, actually did so. We referred that issue to our commissioner, but in the way these cases so often have, his inquiry greatly broadened out, with our permission, and he ended up making sweeping Findings covering the whole history of the case. Nevertheless he did not reopen or reconsider rulings he had made excluding evidence on the ground of the narrowness of the original issue. The result is that the evidence is incomplete. If we are going to indulge in the sweeping review the commissioner's Opinion and Findings, even as modified, indicate, we should first reopen the record and get all the pertinent documents properly before the court. If we stick to the narrow scope of review indicated by the authority cited, supra, the record is sufficient, but in that event much of the Opinion and Findings are surplusage and should be eliminated.

I think I am entitled to consult the entire administrative record for the pur-

pose of determining whether the adjudication of this case on fragments of that record is proper, and that I have done. The court papers include a number of documents that apparently came to us as part of the administrative file on the cross-motions, but were either offered in evidence before the commissioner and excluded, or else were not even offered.

It would perhaps, be inappropriate to consult evidence not admitted by the commissioner in order, e. g., to propose reversing him on the facts, but that I am not doing. Cf., however, Osage Nations of Indians v. United States, 97 F.Supp. 381, 119 Ct.Cl. 592, cert. denied, 342 U.S. 896, 72 S.Ct. 230, 96 L.Ed. 672 (1951), in which we took judicial notice of an array of historical material, not before the Indian Claims Commission, including a lawsuit between different parties in another court, in order to reverse certain of its fact findings. Chief Judge Jones and Judge Howell would have remanded to the Commission for consideration of the new material (which is what, as an alternative, I would do here) except that they deemed that this court was exercising equity powers.

I think we are entitled to consider what is in our court records for the limited purposes I consider it. Fletcher v. Evening Star Newspaper Co., 77 U.S. App.D.C. 99, 133 F.2d 395 (1942), cert. denied 319 U.S. 755, 63 S.Ct. 1163, 87 L.Ed. 1708 (1943); Porter v. Merhar, 160 F.2d 397 (6th Cir. 1947).

Like the dissent, I draw certain inferences from the record which the plurality does not recognize, only mine are different from the dissent's. E. g. the dissent infers the presence of a "hatchet man" in the CSC and I infer a mere blunderer. We are all guilty of "speculation" if one likes to use the word. In Weiss v. United States, 180 Ct.Cl. 863, 871 (1967), I stated for a unanimous court as follows:

 \* \* \* This court has not sat for over 100 years without acquiring some Judicial knowledge of how things are done in the executive branch. \* \* \*

Of course the idea cannot be pushed too far, but at any rate, if the technique was valid to enable us to say in *Weiss,* that:

 \* \* \* The JAG final opinion afforded documentation and justification for the Secretary's decision, which he needed and waited for.

as to which there was no direct evidence, it is equally valid to enable us to draw certain fact conclusions herein, as I do. I turn, therefore, without further apology, to the history of the claim as revealed in the court papers. I do not obtain facts about the case from any other source.

Plaintiff, a veteran, was a clerk typist at the Air Force Accounting and Finance Center at Denver, Colorado. The Air Force sent a letter to the CSC requesting her involuntary retirement under the law referred to above. That letter is in the administrative file but it lists enclosures on the lower left hand corner which are now not attached. One of these, I am certain, must have been an account of plaintiff's behavior on the job. Where, as I presume here, unsatisfactory performance on the job, in the first place generates the suspicion of mental disability, and where, as here, ability to do the job satisfactorily is the controlling consideration, it is inconceivable that such a report would not have been forthcoming. The Air Force also referred to a diagnosis by a J. P. Hilton, M. D., of Denver, who sent a letter marked Personal and Confidential to a Dr. Albers of the Finance Center, stating that his diagnosis of plaintiff's condition was schizophrenic reaction, paranoid in type. That was offered in evidence and the commissioner excluded it. When the plaintiff went to see Dr. Overholt, as appears in the Findings, she gave him a long account of her consultation of Dr. Hilton and the reasons. He took it down and it is part of his report which is in evidence. The agency had asked her to go to a Government doctor and she at first refused, but finally requested permission to consult Dr. Hilton who was a private physician. She became aggriev-

ed against him because he transmitted his adverse diagnosis to a friend in the Air Force. Naturally, a diagnosis from a proposed retiree's private doctor had more weight with the CSC than one by a Government doctor, and an interoffice memo in the administrative file indicates that it was so regarded by the Board of Appeals and Review. It is the commissioner's exclusion of this diagnosis that enables our dissenters to argue that the evidence before the CSC was sketchy. Why the CSC wanted another diagnosis is not entirely clear but obviously the matter was important enough to justify getting two. Inferentially, however, Finding 5 shows the CSC would have acted on the Hilton diagnosis alone, and sought another only after it became apparent that plaintiff had retained counsel, and there was going to be litigation in all probability unless they backed down. Furthermore, use of Dr. Hilton's diagnosis in litigation might have embarrassed him by exposing him to the charge, whether valid or not, that he had violated his Aesculapian oath. That would have been regrettable, but the exclusion of the Hilton diagnosis and the silence of the Findings about it produce a distorted impression as to the substantial nature of the evidence before the CSC. Moreover, the impression is conveyed that the CSC doctor, Dr. Tish, Chief of the Disability Retirement Section, invented the charge that plaintiff was a schizophrenic paranoic out of thin air, and this idea is taken up by our dissenters herein. Finding 4 refers to the fact that the Air Force referred to a "disability diagnosis in a report by a psychiatrist" though in fact Dr. Hilton did not say plaintiff was disabled and did say that his diagnosis was schizophrenic reaction, paranoid in type.

The Opinion and Findings describe how Dr. Tish requested a new diagnosis from doctors attached to the Veterans Administration Hospital after the plaintiff had showed fight and retained counsel, and how plaintiff went there. The reports by the psychiatrist, Dr. Overholt; a general physician, Dr. Masten; and Dr. Herring, a psychologist, are shown in the Findings. The curious thing here is plaintiff's testimony about this visit. She denied that Dr. Overholt or anyone else gave her a psychiatric test at that time, but claimed she was examined by a Dr. Baumgarten. The Government showed that there was no Baumgarten in the hospital at the time of the only examination the plaintiff had, but that a doctor of that name was added to the roster afterwards. Plaintiff was thus caught in a fabrication that could not but have been deliberate. I consider this would require dismissal under 28 U.S.C. § 2514. See my concurring opinion in Eastern School v. United States, 381 F.2d 421, 438, 180 Ct.Cl. 676 (1967). I do not understand why our commissioner's sweeping and detailed Findings include no reference to Baumgarten.

Dr. Masten found nothing wrong with plaintiff except halitosis, but there is a typed statement at the foot of his report alleging that the plaintiff is totally disabled, Finding 21. The parties stipulated that neither Dr. Masten or Dr. Overholt wrote this and there is no evidence who the guilty party was. The commissioner characterized this statement as arbitrary and capricious. That is an instance of verbal over-kill. No one out to railroad the plaintiff into involuntary retirement would perpetrate anything so absurd as a claim of total disability on a finding of halitosis. It seems obvious to me that this is an instance of clerical error such as might occur in any large office where statements have to be typed repetitively on numerous documents. I entirely agree with the commissioner that this clerical error could not influence the judgment of the CSC.

The terms "arbitrary and capricious" are epithets applied by judges and lawyers to what they deem abuses of power, by persons who have some. "Arbitrary" standing alone means about the same. The act of a person having no legal power cannot be arbitrary or capricious in the legal sense. Clerks do not have that kind of power. Thus "arbitrary and

capricious" and "clerical error" are antithetical concepts, both of which cannot apply accurately to the same act. There is no evidence that anyone having legal power wrote the statement, or directed it to be written, and the stipulations and evidence seem to eliminate all persons in that category whose names are before us. If a clerk wrote it *sua sponte* his act might have been a fraud, a forgery, or a mistake, but it could not have been arbitrary or capricious. There is another possibility: that a person having legal power wrote it, but sought to pass it off as Dr. Masten's statement, not his own. That seems to me unlikely, for the reason already given, but for completeness let us not exclude it. Since the effect of typing the statement above Dr. Masten's previously affixed signature would make it falsely appear it was Dr. Masten's statement, that too would be a fraud or forgery, and not arbitrary or capricious. The offender's legal power would be irrelevant as to a statement he passed off as someone else's.

This is not just an exercise in sterile semantics. Many of us may be and frequently are arbitrary and capricious in the legal meaning, in perfect good faith, from a mistake as to the scope of our lawful powers or as to the sufficiency of the reasons for exercising them. This court frequently calls actions of administrative tribunals arbitrary and capricious, with no sense that it is impugning the honesty or honor of their members. On the other hand, no one would accuse another of forgery or fraud without expecting that the accusation would boomerang absent convincing proof. The dissent says, properly in its view of the facts, that we are concerned with wilful wrong doing. My analysis I think has shown that we are here indeed concerned with an issue of wilful wrong doing versus honest mistake, notwithstanding the unfortunate "arbitrary and capricious" terminology first introduced into the case by our commissioner.

In Irolla v. United States, 390 F.2d 951, 182 Ct.Cl. 775 (1968), we considered accusations of fraud against a deceased taxpayer. While we sustained them, it was only on the basis of evidence we considered compelling, as to his actual state of mind. We had a vigorous dissent which denied that the evidence was sufficient. It stated that the evidence Mr. Irolla had a fraudulent intent to evade taxes failed to show it "by clear and convincing evidence." It said the Government's case was "made by piling inference on top of inference and suspicion on top of suspicion, without any substantial, much less clear and convincing, evidence to support it."

I agree that legal proof of fraud cannot be assembled in that manner. I think the evidence as to the existence of the supposed "hatchet man" in the CSC, who *ex hypothesi* committed forgery or fraud, should be tested in similar fashion, and so tested, must be found similarly put together. The "irrefragable evidence" test of *Knotts* assuredly is not less exacting than the "clear and convincing evidence" test. If the "hatchet man" hypothesis fails, the case is one of honest mistake.

The civil servant is, in the eyes of many, game always in season. In Government civilian personnel disputes, charges of official bad faith are blithely bandied about. Any civil servant, except a plaintiff, concerned in such a controversy may find his honor and professional reputation at issue, in litigation wherein he is not a party and is not represented by counsel. And this although he is a salaried man who has not one dollar riding on the outcome of the case. It was considerations such as these, I think, that led the experienced judge who wrote the court's opinion in *Knotts,* supra, to require that proof of bad faith on the part of an official involved shall be "well-nigh irrefragable."

The dissent is commendably reticent in naming the "hatchet man" who was guilty in its eyes of this forgery or fraud. I do not suppose the "irrefragable proof" should be any less just because the accused official is left unnamed.

Since the retirement was for psychiatric disability, and since for whatever reason the Hilton diagnosis was dropped into limbo, obviously the Overholt diagnosis was crucial, though it had support by the psychologist. Dr. Overholt testified that he did not remember plaintiff personally, but nothing except plaintiff's patent falsehoods was elicited to suggest that the written record of his examination was false in any material respect or that he was not qualified to make the examination.

Dr. Hilton had said plaintiff's condition was "schizophrenic reaction, paranoid type". Dr. Overholt's diagnosis was:

Schizophrenic reaction, chronic, undifferentiated type, in partial remission. External precipitating stress, and predisposition not determined by this examination. Impairment, severe. Competent.

"Competent" simply meant plaintiff's pension would safely be paid direct to her, so that a guardian or conservator was not necessary.

This is the fourth case to come before us in six months involving plaintiffs having or alleged to have somewhat similar sounding disabilities. The other cases are: Russell v. United States, 183 Ct.Cl. —— (No. 30–65, decided April 19, 1968); Seebach v. United States, supra, (January 19, 1968); and Davis v. United States, 181 Ct.Cl. 1095 (1967). I think it is time we began to take some judicial notice of what these words mean. They are, indeed, in common speech and one can find definitions in abridged dictionaries, not just medical dictionaries or those that are unabridged. I take the following from Webster's Seventh New Collegiate:

PARANOIA.—a rare chronic psychosis characterized by systematic delusions of persecution or of grandeur usually not associated with hallucinations.

PARANOID SCHIZOPHRENIC.—a psychosis resembling paranoia but commonly displaying hallucinations and marked behavioral deterioration.

SCHIZOPHRENIA.—a psychotic disorder characterized by loss of contact with environment and by deterioration of personality.

Dr. Overholt was a V.A. doctor. The V.A. general rating formula for psychotic reactions is set forth in the *Davis* case and indicates that on a scale of 100 "severe impairment" means 70%.

In view of this, the testimony, arguments, and findings concerning who was to determine if plaintiff was "totally disabled" appears to me to relate to a ministerial function and to involve some splitting of hairs. The failure to retire plaintiff on a pension would have been a shocking miscarriage of justice, both as to her and as to the employing agency.

In the *Russell* case the plaintiff had in his medical record a finding by a non-psychiatrist doctor reading in pertinent part:

Schizophrenic reaction, paranoid type, chronic, moderate * * * impairment moderate.

We held that this was "evidence of mental illness" such that under pertinent Air Force regulations, it was an error of law to discharge plaintiff without ordering a psychiatric examination by a psychiatrist. The "evidence of mental illness" here is assuredly far stronger even if we do not reopen the case, as I have suggested, to admit all the evidence that was placed before the CSC.

It may be added that after "severe impairment," 70%, the only higher V.A. rating was "complete inadaptability," 100%. I take it that these are the committable insane, among whom of course plaintiff was not included. The implication of Dr. Overholt's word "competent" is to exclude plaintiff from that category. If, however, the classification of a psychotic person as "competent" is taken to throw doubt on a CSC finding of "total disability" the result is that the Executive Branch is apparently required to retain on active duty status all psychotic employees except the committable in-

sane. This notwithstanding the disasters victims of "severe impairment" might cause to themselves, to private persons who are obliged to deal with the Government, or to the Government itself. I see this issue as what this case is really about, and why it has demanded so much cerebral effort from my brothers and myself. Of course, there exist serious social problems as to who is to protect, support, and maintain those whose impairment is 70% or under. I do not think that in the case of Federal employees the Congress intended that the solution should be retention on the active duty payroll. As I see it, the provisions for disability retirement with pension were intended to provide a practical and humane solution. I think they should be construed with that purpose in mind. On the other hand, the *Seebach* case illustrates that disability retirement is not the means of getting rid of any employee who may be merely contumacious or troublesome.

The reports of Drs. Overholt, Herring and Masten went to Dr. Tish. He took the stand. Except for his ultimate conclusion that the plaintiff was totally disabled, I think the record tells us nothing of what he really made of these reports. He made the extraordinary assertion at one point that he could not conclude from the reports signed by Drs. Masten, Herring and Overholt that they had even seen the plaintiff, although all three said they had done so over their signatures. Although he had himself requested the diagnosis by Dr. Overholt he told our commissioner that it was immaterial and that he concluded nothing from it. As regards the record before him before he requested the Overholt report, he said in one place that he had "no competent psychiatric report." Yet he told the plaintiff by letter at that time that the CSC felt she was "totally disabled for useful and efficient service as a clerk typist" because of her psychiatric condition. He was not himself a psychiatrist and neither he nor anyone else at CSC headquarters had seen the plaintiff. At another point in his testimony he could not recall whether he had a psychiatric diagnosis before him at that time, but he finally said only that there must have been a "statement" of some kind. In fairness to him, the word "competent" was put in his mouth by cross-examining counsel and whether he meant legally inadmissible or not professionally trained is not at all apparent. Furthermore, during the long course of his testimony about the report from Dr. Overholt and other reports from the V. A. hospital it does not appear that anyone advised him that when asked to testify about matters covered by or referred to in written records he could consult the records if his memory was weak.

Testimony showed that the plaintiff had brought suit in the Colorado State Courts against Dr. Overholt and the administrative file shows that she had sued Dr. Herring and the other Denver doctors as well. I take judicial notice that any doctor, if he can help it—and he generally can help it—will not give court testimony that will assist the prosecution of a law suit against another doctor. It seems apparent to me that Dr. Tish's testimony got off into fantasy whenever he was interrogated about the actions or advice of one of the other doctors. The record suggests that they did contribute materially to the final adjudication, but he keeps insisting they did not. The failure to confront him with the records assisted him in this evasion.

If this analysis of the Tish testimony is valid, it indicates to me the court should not make a series of Findings, as it has done, based solely on the Tish testimony. I would have adopted a set of severely curtailed Findings because of my inability to believe anything Dr. Tish said in testimony and the irrelevance of most of it anyway. Dr. Tish was not a party and I see no reason to deem the defense bound by his testimony. At the same time, however, I cannot agree with the dissent, that Dr. Tish prejudged the case or was committed to obtain the plaintiff's retirement. There

is not a scintilla of evidence to show that either Dr. Tish or anyone else in CSC headquarters had ever even heard of the plaintiff until the retirement papers came through. They were in Washington, D.C., she in Denver, Colorado. Most claims of bad faith in Government removal actions, as for example, in *Knotts*, supra, reflect the animosity that may arise in the course of long personal contact in a Government office. That anybody at CSC headquarters entertained such feelings towards our plaintiff requires postulation of some remarkable circumstance, the nature of which cannot even be guessed. The surmise suggested above provides a much more natural and believable explanation of the Tish testimony.

I agree with the dissent that Dr. Tish's testimony by itself fails to show that the CSC had evidence before it that plaintiff was disabled. The dissent, however, erroneously assumes the defendant had the burden of proof as to this. If plaintiff's counsel intended to challenge the Government on the issue, as it is clear he did not, the burden would have been on him. He would have had to show, not just a lack of substantial evidence, but of any. To do this, he would have had to put before the court the entire record that was before the CSC. The record itself, not just testimony about it by a person with a failing memory. He did not do this. Thus, giving the Tish testimony its fullest force for plaintiff it only tends to show that the Overholt, Masten, Herring diagnoses were inadequate. But he did not remember what else he had, and was not allowed to refresh his memory. His statement he had no "competent" evidence must be construed in light of his ultimate admission that he did not remember what he had, but must have had "a statement." The dissent can only ascertain that the "statement" fails to support the CSC action by looking at it, which is precisely what it says I must not do, because it was not received in evidence. It is, however, as urged above, I think an unwarranted assumption that the papers now in the court files, but not in evidence, constitute with the evidence the entire record that was before the CSC. An incomplete selection of evidence before the CSC cannot possibly prove the CSC had no evidence, or even that it had no substantial evidence. I would have joined the dissent in urging the court to reopen the record and receive everything that was before the CSC, but I understand the dissenters do not desire this.

The dissent says that the CSC Board of Appeals and Review referred the plaintiff's appeal to Dr. Tish and in effect he was asked to review his own decision, to which the Board applied a perfunctory rubber stamp. At the risk of being tiresome, I will say again that we do not have before us in evidence all of the record that was before the Board, and so we do not know what, if any, corroboration of Dr. Tish's views they may have had, besides his own statements. It is mere speculation whether their consideration was perfunctory or otherwise.

I do not agree with the excoriation of Dr. Tish delivered by our dissent, but I am not very sorry it has happened because I believe he asked for it. It is to be hoped that the CSC henceforward will impress upon doctors testifying on its behalf on disability issues that their obligation to the court is to tell the complete truth, and this takes precedence over their obligation to shelter other doctors. But I do not think we can indict an entire profession. Until something is done to change the medical mentality our judges and juries must achieve as much justice as they can in cases requiring medical testimony. The circumstances cannot be cured by pretending they do not exist.

As I see it, therefore, plaintiff's able counsel did not really try to show that the CSC decision lacked support in the evidence, and the case he did put in omitted much that would have been indispensable for a holding along such lines. Evidence that was before the

CSC is not before us. Therefore, I object to findings that are relevant only on the theory that we have reviewed the CSC proceedings for evidentiary sufficiency. I object to findings based on Dr. Tish's testimony. On the record as it now is plaintiff cannot recover. If, however, we suspect that the entire body of evidence before the CSC was insufficient to sustain its determination, we should reopen the record to find out what that evidence was. If we suspect the presence of a "hatchet man" in CSC who committed forgery or fraud to secure plaintiff's retirement, we should not dispose of this case on speculation: we should make a resolute effort to ascertain who he was and how he operated.

SKELTON, Judge (dissenting):

Although I hesitate, as a rule, to express dissent, I feel bound to do so in this case. After a careful review of the plurality opinion, the briefs of the parties, the transcript, and the exhibits, I unhesitatingly conclude that this case " 'exude[s] an odor piscatorial.' " Alinco Life Ins. Co. v. United States, 373 F. 2d 336, 341, 178 Ct.Cl. 813, 823 (1967).

We are authorized to set aside the Civil Service Commission's (CSC) determination of disability in an involuntary retirement proceeding, or refuse to recognize it as valid, where there has been a substantial departure from important procedural rights or some like error " 'going to the heart of the administrative determination.' " Gaines v. United States, 158 Ct.Cl. 497, 502 (1962), cert. denied, 371 U.S. 936, 83 S.Ct. 309, 9 L. Ed.2d 271 (1962). There does not appear to be a well-defined meaning of the term "like error going to the heart of the administrative determination," although the courts use the term in many cases. It would seem to include within its meaning any arbitrary and capricious action, or any unconscionable abuse of executive discretion, or any action based on facts outside the evidence, or on illegal or fraudulent evidence. Under any of these circumstances, the term becomes doubly operative when there is no substantial evidence to support the action taken.

Most of these elements are present here. The unauthorized conclusion on Dr. Masten's report was both illegal and arbitrary, and was enough to void the whole proceeding. If there were any other facts to support the action taken, they were outside the evidence. Consequently, the administrative determination of plaintiff's alleged disability appears to be an unconscionable abuse of executive discretion, which was arbitrary and capricious and not supported by substantial evidence. The following discussion will demonstrate the reasons for these conclusions of error "going to the heart of the administrative determination." This is a question of law which is always to be determined by the court, because it involves the correct standard of an administrative decision. If it could be argued that plaintiff did not raise this point, such failure would be wholly immaterial. This is an issue of law and is not the kind of legal issue as to which a litigant can bind the court by his failure to raise or press the point. Our decision in J. A. Jones Constr. Co. v. United States, (February 1968) 390 F.2d 886, 889, 182 Ct.Cl. 615, 620, is squarely in point. There we said:

We take this position even though plaintiff did not contend (and indeed specifically disclaimed) that the Government should be held liable for what the Air Force knew but failed to disclose. *This is an issue of law and, moreover, not the kind of legal issue as to which a litigant can perhaps bind the court by his failure to raise or press the point.* Defendant's liability for the Air Force's knowledge (in the circumstances here) seems to us very clear, and we would not be justified in deciding for the defendant— possibly—simply because plaintiff chose to argue less persuasive grounds. * * * [Emphasis supplied.]

See also, John A. Johnson Contracting Corp. v. United States, 132 F.Supp. 698, 132 Ct.Cl. 645, 656 (1955).

## I

*Consideration of the Unauthorized Statement "Patient is Totally Disabled" by the CSC Voids the Administrative Determination of Disability*

It will be recalled that plaintiff's employer, the Finance Center, filed an application with the CSC for her disability retirement. The evidence shows that this application was filed because of an alleged report of an alleged agency psychiatrist. (Finding 4.) Neither the contents of the report nor the identity of the psychiatrist was admitted into evidence in this case.

As a result of this application, Dr. Alexander Tish, Chief of the Disability Retirement Section, Medical Division, Civil Service Commission, informed plaintiff by letter that the medical officers of the CSC felt she was "totally disabled for useful and efficient service as a clerk-typist," and her case would be adjudicated on the basis of the available evidence in her file. In response, plaintiff protested and requested a hearing. It was then that Dr. Tish notified the plaintiff that no decision had been reached in her case and that she would be given a psychiatric examination, but that she would not be given a hearing.

Dr. Tish made arrangements for plaintiff to be examined in Denver, Colorado. He sent an Authorization for Medical Examination Form, CSC Form 3135, to the Veterans Administration Regional Office which was used to authorize medical examinations of the plaintiff for consideration in connection with possible Civil Service disability retirement.

Although Dr. Tish stated that he did not have before him "a competent psychiatric examination" at the time he ordered an examination of the plaintiff (finding 10), he wrote in a space on the form next to the printed words "Disabilities Indicated by Medical Evidence," the words "Schizophrenic reaction, Paranoid type." This statement was emphasized by the fact that Dr. Tish also wrote on the form "application filed by the Dept. against wishes of employee," thereby inferentially indicating that the employee's mental condition was so bad the department had to take action.

There were no qualifying words on the form such as "alleged" disabilities or disabilities "appear to be" but rather, the persuasive and positive phrase of "Schizophrenic reaction, Paranoid type." This is all the more astonishing in view of the fact that Dr. Tich is not a psychiatrist; never saw, much less examined, the plaintiff, and did not have before him "a competent psychiatric examination." These facts are only mentioned to point up the questionable nature of the proceedings at this early stage.

In any event, Dr. Tish did not have sufficient evidence on which to base a determination of total disability, and directions on the form instructed the examining physicians to furnish that information. Form 3135 which he sent to the Chief Medical Officer of the Regional Office of the Veterans Administration in Denver, Colorado, authorizing the examination of the plaintiff, directed that reports be made on the following:

1. General medical examination:
* * *

&ast; &ast; &ast; &ast; &ast; &ast;

5. Nervous system: * * *
Competent to handle funds or is a guardian necessary?

> *Neuropsychiatric exam. authorized.*
> [Emphasized portion was handwritten]. [Emphasis supplied.]

Here we see again how plaintiff's case was being prejudged. This is shown and emphasized by Dr. Tish's handwritten statement "Neuropsychiatric exam. authorized" immediately after the printed question "Competent to handle funds or is a guardian necessary?" When you consider that this follows the other statements on the form, as stated above, that the "application [for retirement was] filed by the Dept. against wishes of employee" and "Disabilities Indicated by Medical Evidence: Schizophrenic re-

action, Paranoid type," it is apparent that, in effect, suggestions were being made to the examining doctors at the V. A. as to what was expected on their reports, all as shown by the handwritten entry on the printed and typed form. The examining doctors would have been blind indeed if they could not understand from all of these instructions the kind of adverse reports that were expected from them.

But there is more—much more. Just above the initials of Dr. Tish at the bottom of Form 3135, appears the following additional instructions:

Please report your findings, diagnosis, and conclusion on the accompanying medical report form, and *conclude your report of examination by stating whether the above person IS OR IS NOT totally disabled for useful and efficient service in the position above noted,* and whether or not the disabilities found are due to venereal disease, alcoholism, or any vicious habits. *Your reasons for a conclusion of "total" disability should be fully stated.* [Emphasis supplied.]

These instructions were really those which covered the purpose of the examination, namely, to find out medically whether or not plaintiff was totally disabled for useful and efficient service in her position, and, if so, the reasons why she was totally disabled. When this form with all these notations and instructions reached the V.A. Hospital, a Dr. Masten, who was an M.D. but not a psychiatrist, gave the plaintiff a general medical examination and made his report of same to Dr. Tish on a printed form (CSC Form 3178). He made his entries on the form in his own handwriting, signed it and mailed it to Dr. Tish. He did not say anything on the form concerning whether plaintiff was or was not disabled. He only showed that she had "halitosis." However, when Dr. Tish examined Form 3178 sent to him by Dr. Masten showing the results of his examination of the plaintiff, the following words were found to be

typed on the form under the heading labeled *Conclusion:* "*Patient is totally disabled. Disabilities are not due to venereal disease, alcoholism or vicious habits.*" [Emphasis supplied.] No one knows who typed these words on the form. It was stipulated that they were not put on the form by Dr. Masten or by Dr. Overholt. There is no stipulation or evidence as to what role, if any, other doctors or nurses or other personnel who handled this form may have played with reference to these unauthorized words. We know that Form 3178 was sent to the V.A. Hospital by Dr. Tish at the same time he sent Form 3135.

The plurality opinion approves the commissioner's holding that "the statement * * * is obviously an arbitrary statement," but adds the words "if it was not merely a clerical error." This suggests that it was in fact a clerical error. I cannot agree. It has all of the earmarks of an intentional wrongful act. Of course, a wrongdoing for an ulterior purpose should not be lightly inferred. It should never be assumed when it is due to negligence, inadvertence, or error. But, as here, where the wrongful act was a positive and affirmative one that could have had no other purpose than that of harming the plaintiff on the one and only issue in the case, we cannot lightly pass it off as being an error. Furthermore, there was no evidence whatsoever that it was due to an error. On the other hand, the facts strongly indicate that it could not have been an error. For instance, Form 3135 instructed the examining doctor to not only state whether the plaintiff is or is not totally disabled, but also "whether or not the disabilities found are due to venereal disease, alcoholism or any vicious habits." The author of the unauthorized disability "conclusion" carefully followed these instructions and wrote on the report in the very language of the instructions the words "disabilities are not due to venereal disease, alcoholism or vicious habits." All of these facts pointedly indicate that the perpetrator of this arbitrary act carefully read the instructions

and deliberately, intentionally, and purposely complied with them by falsifying the report. This was no clerical error. However, our hatchet man, whomever he may have been, did not state reasons for the "total disability" conclusion as required by the form. No doubt he concluded that it would be "gilding the lily" too much for him to conjure up reasons for a total disability which did not exist. As was aptly stated many years ago:

> Some circumstantial evidence is very strong as when you find a trout in the milk. Henry D. Thoreau, Journal, November 11, 1850.

It should be pointed out that Form 3178 has the following instructions to the examining doctors at the V.A. Hospital:

> The examiner will please make full report on each complaint or disability that is alleged or found on examination. *If total disability for useful and efficient service is established, please show when such total disability began. See also instructions on Form 3135.* [Emphasis supplied.]

This is in addition to the instructions on Form 3135. We see that on both forms the doctors were instructed to make a full report as to whether the plaintiff was or was not disabled. Disability was the ultimate issue involved. Its determination was the purpose of the examination. When the words "Patient is totally disabled" appeared on the doctor's report, they covered the heart of the case. There was nothing else to be resolved.

The evidence shows that Dr. Tish assumed the conclusion was in response to his specific directions, and also that he did not know whether Dr. Masten was a psychiatrist at the time he reached his decision that plaintiff was totally disabled. (Finding 24.) Dr. Tish also testified that he did not assume it to be a psychiatric conclusion. The record demonstrates that it was Dr. Tish's opinion that the conclusion recorded on Dr. Masten's report was not material to the decision to retire plaintiff. (Finding 24.)

Nevertheless the plurality says "despite the fact that the directions * * * may be read as indicating that the conclusion was a material part of the reports of the examining doctors, *it is clear* that the conclusion * * * played no major role in the determination to retire plaintiff." (Finding 25.) [Emphasis supplied.] I am at a loss to know what makes it *clear*, except a possible construction of the self-serving testimony of Dr. Tish given *after* his determination was made and *after* he discovered that he was confronted by an anonymous conclusion.

Let us look at the testimony on this point.

By Mr. Twine: [Counsel for defendant]

Q. Doctor, directing your attention to Commissioner's Exhibit 1–B, there appears thereon the conclusion that the patient is totally disabled. Did that have any effect on your determination as to whether the patient, or employee, was totally disabled?

A. None whatsoever. As I said at the beginning, we are not bound by any opinions or conclusions drawn by any examiner. We have to make our own conclusions and make the decision on a case. * * * [Tr. 219–20.]

I feel that this testimony given by Dr. Tish actually shows that he was influenced by the conclusion. While he says that the conclusion had no effect whatsoever on his determination, he also says that he is not bound by the conclusions and opinions of the examiners. If the conclusion was truly not considered, I find it hard to believe that Dr. Tish would have stated that he was not bound by the conclusion. To summarize, I think that the determination of Dr. Tish was influenced by the arbitrary statement found on Dr. Masten's report because of the following circumstances, among others:

1. Dr. Tish felt the statement was in response to his specific directions.

2. He did not know whether Dr. Masten was a psychiatrist.

3. He did not know that it was an unauthorized statement at the time he made his decision.

4. He thought the conclusion had been put on the form by Dr. Masten and was a part of his report.

As was so aptly stated in Greene v. Harris, 11 R.I. 5, 17 (1875):

> Human nature constitutes a part of the evidence in every case. We more easily believe that a person has done what we should have expected under the circumstances; and we require a greater degree of evidence to satisfy us that a person has done something which would be unnatural or improbable.

Here, human nature more than suggests that the conclusion was considered by Dr. Tish in reaching his decision. To be sure, inference is not certainty, but it is plain enough in these circumstances to justify a finding of fact. As the plurality concedes, if such statement had been accepted by the CSC, thereby influencing the administrative determination, the decision to retire plaintiff would not stand. In my opinion, it must be conclusively presumed that the statement influenced the administrative decision.

Accordingly, the decision is arbitrary and unfounded and cannot stand. It is similar in many respects to the administrative decision in John W. Hankins v. United States, Ct.Cl. No. 20–67, decided March 15, 1968, slip op. pp. 5–6, wherein we said:

> * * * An action resting significantly on such improper materials [void efficiency reports], as was the Secretary's in this case, cannot be permitted to stand. It is, of course, a general principle that an administrative decision, even a discretionary one, grounded in considerations which the tribunal should not take into account, or evidence or materials it should not weigh, is vulnerable as arbitrary and unfounded. Cf. Harmon v. Brucker,

355 U.S. 579, [78 S.Ct. 433, 2 L.Ed.2d 503] (1958); Hamlin v. United States, No. 251–67, [391 F.2d 941] decided this day; Motto v. United States, supra, note 1, 172 Ct.Cl. 192, 348 F.2d 523; Egan v. United States, supra, 141 Ct.Cl. at 23–25, 158 F.Supp. at 390–391.

## II

*A Decision Replete With Errors "Going To The Heart of The Administrative Determination" Cannot Stand*

The record shows that when the CSC first decided to retire plaintiff, it did not have before it sufficient evidence to support a finding of total disability. Additional evidence in the form of reports from both a psychiatrist and psychologist are alleged to have made up the deficit in proof.

I can dispose of the report of the psychologist, as an aid to the quantum of proof needed to support the determination, rather quickly. Dr. Tish testified that the comments and conclusions of the psychologist "are only of help to the psychiatrist who sees the individual." His testimony revealed that the psychological diagnosis meant nothing since the psychologist "is not an M.D." (Tr. 236, finding 26.)

I turn then to the *circumstances* surrounding the psychiatric examination and report. As I indicated earlier, Dr. Tish did not have sufficient information to make a determination prior to referring the plaintiff to Denver for psychiatric examination. His testimony was that he wanted a certified psychiatrist to examine plaintiff before he would reach a decision. (Tr. 221.)

Dr. Lewis Overholt was the examining psychiatrist who returned the form to Dr. Tish with the following diagnosis:

> Schizophrenic reaction, chronic, undifferentiated type, in partial remission. External precipitating stress, and predisposition not determined at this examination. Impairment, severe. Competent.

It is manifest from the evidence that according to Dr. Tish, Dr. Overholt's diagnosis was *immaterial* to his evaluation of the claim because the Medical Division looks behind the diagnosis to the substance of the psychiatric report and may agree or disagree with the diagnosis made. (Finding 26.)

This testimony is particularly frightening since the opinions of the only other doctors have already been discarded as "immaterial." If this psychiatrist's opinion is likewise rejected, then there is no evidence, substantial or otherwise, on which an adverse decision can rest.

Dr. Tish's testimony on this point is both puzzling and incredible. Before relating it, let me reiterate that this was the report Dr. Tish was awaiting before a determination would be made.

After admitting that there are various kinds of schizophrenia, some disabling and some not, his testimony in response to questioning continues:

Q. What does the word "competent" mean to you, Doctor, in that report from Dr. Overholt?

A. It only means that she is competent to handle, to function. That is all we are interested in from the standpoint of the annuity funds that we pay her. [Tr. 232.]

After previously admitting (Tr. 230), that he wanted a statement concerning her total disability, Dr. Tish then testified:

Q. Were you asking the psychiatrist, in your direction here, to make any determination as to whether she was capable or whether she was disabled to handle her job as a clerk-typist?

A. That is not his business. We don't ask him that question. [Tr. 232.]

Utterly amazing to me, however, is the following excerpt from the transcript with reference to Dr. Tish's testimony concerning Dr. Overholt's diagnosis:

Q. What does pre-disposition not determined at this examination mean?

A. I don't know what he means by that.

Q. Look at the Overholt report and tell me what that means to you?

A. Pre-disposition, we are not interested in that determination, anyway. So it is irrelevant, as far as disability retirement is concerned.

\* \* \* \* \* \*

Q. Now, from the diagnosis made by Dr. Overholt, did you conclude that he found Mrs. McGlasson to be totally disabled from performing services as a clerk-typist?

A. I did not conclude from the diagnosis anything. In the first place, a diagnosis is immaterial in evaluating a claim. It does not make any difference what kind of label it is. Let's get this straight.

Coming to the question of diagnosis that you are pinning me down on, I would like to elaborate because I think it is important. It does not make any difference what label a psychiatrist puts upon a patient. We are only concerned whether the individual is or is not suffering from a nervous disorder of such degree that he or she is unable to function in that job. That is all we are concerned with. We are not concerned in the label that he puts on her. He can call her anything he wants. The label is immaterial.

In fact, we often disagree with the label that some of the psychiatrists put on their patients. Sometimes they are mis-labeled, so, therefore, a label is not a criterion for an evaluation of a mental or nervous disorder.

Q. What is important, Doctor, is whether or not the patent is disabled on the basis of what they have, is that correct?

A. Yes. The way we do that is, or the way he does it, is from his observation of the patient. This psychiatrist interviews a patient, and he gives us that information in the gist of his report. [Tr. 235–37.]

The following extract from the transcript also illustrates that Dr. Tish's testimony was guarded and positively inconsistent:

Q. Based on this folder, you concluded, did you not, that Dr. Masten, Dr. Herring and Dr. Overholt had all seen the plaintiff, Mrs. McGlasson, in this case, is that correct?

A. No, I did not conclude that at all.

Q. You did not conclude that they had seen her?

A. No.

Q. Whom did you conclude, from this examination, Doctor, had seen the plaintiff in this case?

A. I would say that all I can tell from this is the Veterans Administration carried out our order to examine the individual and report their findings. These are the findings they submitted to me.

Q. You made no conclusion as to who saw her?

A. No. We are not interested in who saw her, who saw the individual, so long as she was seen by a qualified psychiatrist. [Tr. 228–29.]

Dr. Tish has not only contradicted himself numerous times, but also has discarded, as irrelevant, a portion of the diagnosis he can not even understand. For all that appears from the record, it could have meant that plaintiff could perform her clerical duties. Dr. Tish also explains away a nonexistent "label" since Dr. Overholt never reached a conclusion with respect to plaintiff's total disability.

A reading of the diagnosis alone, even if Dr. Tish did consider it material, would not support a determination of total disability. In the first place, the patient is "competent" and in a state of "partial remission," which factors combat adverse indications in the diagnosis. Even this is not the full story, because the "gist" of Dr. Overholt's report does not sustain a determination of total disability.

Included in Dr. Overholt's report is the following:

The description of the external precipitating stress, the predisposing factors and the adjective description of the *estimated resultant incapacity recorded in this examination, are for fuller psychiatric study and treatment purposes.* They are not determinative as a basis for compensation or pension purposes. The adjudicating agencies are responsible for the evaluation of all evidence available in determining entitlement to compensation or pension. [Emphasis supplied.] [Finding 16.]

This portion of the report indicates to me that the later determination that was made by Dr. Tish was left open by Dr. Overholt, and future psychiatric examinations were contemplated, at least by Dr. Overholt.

I do not feel that the plaintiff's objections are merely complaints that the Commission "did not follow every jot and tittle of the applicable procedures * * * with any showing that the alleged departures were substantial or important." Gaines v. United States, supra.

Furthermore, I do not believe that her objections fly in the face of "or disregard the principle that a court cannot substitute its judgment on medical evi-

dence for the determination of the Commission." Ibid. The word determination is injected throughout the plurality opinion. "One of the usual meanings of the word 'determine' is: * * * to come to a decision; * * *." Gooch Milling & Elevator Co. v. Commissioner of Internal Revenue, 133 F.2d 131, 137 (8th Cir.1943), reversed on other grounds, 320 U.S. 418, 64 S.Ct. 184, 88 L.Ed. 139. See Shields v. United States, 375 F.2d 457, 460 (6th Cir.1967). We have said that the administrative decision must have been "conscientiously made." Cooper v. United States, 178 Ct.Cl. 277, 288 (1967). Certainly, there can be no disagreement that a decision is not "conscientiously made" where all the relevant medical evidence is labeled "immaterial" by the decision maker. In the circumstances of this case, the alleged expert opinion of Dr. Tish that plaintiff was totally disabled is nothing more than an ordinary guess wearing evening clothes. Dr. Tish is not a psychiatrist, he never examined the plaintiff, and his only contact with her was by mail. No competent psychiatrist except Dr. Overholt examined the plaintiff and he did not find her to be disabled, but found her to be competent. No doctor, psychiatrist, or psychologist who examined the plaintiff ever found or stated that she was disabled from doing her work—not even to the slightest degree. There is simply no evidence that warranted or supported the administrative decision of total disability.

Notwithstanding the lack of any medical evidence of plaintiff's disability, Dr. Tish and a Dr. Mercer, neither of whom was a psychiatrist, rendered a decision that the plaintiff was "totally disabled for useful and efficient service in the position occupied by her" because of a "nervous disorder * * * schizophrenia." Dr. Tish was the Chief of the Disability Retirement Section and Dr. Mercer worked under him. It can be assumed as a practical matter that Dr. Mercer would not likely take a position different from that of the chief of his section, especially in view of Dr. Tish's heavy involvement in the case. This is made more obvious by the fact that Dr. Mercer did not testify at the trial.

It is a universal rule of evidence in the trial of a case that a doctor who has never seen nor examined a patient is not allowed to give a professional opinion as to whether the patient is or is not disabled. But here we have the extraordinary situation of allowing Dr. Tish and Dr. Mercer, who had never seen or examined the plaintiff, to give their opinion that she was "totally disabled because of a nervous disorder." The error is compounded when they are allowed to give their opinion on mental disability because of a *nervous* disorder, when they are not psychiatrists and had never seen the plaintiff. The error is doubly compounded when these doctors are allowed, under these circumstances, to make the final decision on the ultimate issue in the case, namely, the alleged disability of the plaintiff. Furthermore, this decision was made without any medical report of disability by any doctor who had examined her, and on the other hand, in the face of Dr. Masten's report that she only had "halitosis" and Dr. Overholt's report that she was "competent."

The plaintiff appealed the decision and it was submitted to Dr. Tish for consideration. He reviewed the file and came up with the same decision he had made before. As the plaintiff so aptly phrased it, "* * * this was not a review at all, but simply Dr. Tish reviewing Dr. Tish." While this procedure may have been in accordance with the regulations, it occurs to me to have been improper and unjust under the circumstances.

The final review by the Board of Appeals and Review appears to have been nothing more than the perfunctory rubber-stamping of Dr. Tish's decision made below.

I conclude that there was no substantial evidence to support a determination that plaintiff was totally disabled, and the decision was arbitrary and capri-

cious and an unconscionable abuse of executive discretion.

## III

### Conclusion

The plaintiff asked for a hearing in this case, but this was refused by Dr. Tish, who purported to act for the Commission. (Finding 5.) It appears that the plaintiff was not entitled to a hearing as a matter of right under the rules and regulations of the CSC then in force. However, the denial of a hearing, when combined with the other "goings on" in this case, emphasizes the error and injustice which might have been avoided if the plaintiff had been given the right to present her side of the case at a fair and impartial hearing before an unbiased and unprejudiced commission. Any citizen is entitled to this much and should be granted no less.

We have a situation in this case where the Disability Retirement Section of the CSC was the accuser, the prosecutor, the judge and jury, and, perhaps, the executioner. The plaintiff did not have a ghost of a chance. She did not even have an opportunity to defend herself or to present her side of the case. She was disposed of utterly and completely under the name and guise of a CSC administrative proceeding as if that proceeding breathed legitimacy and correctness into the action taken. It reminds me of a very apt statement made in another case, "The most odious of all * * * [decisions] are those which mask as justice." Krulewitch v. United States, 336 U.S. 440, 458, 69 S.Ct. 716, 725, 93 L.Ed. 790 (1949) (concurring opinion Jackson, J.). If this case is an example of justice in an administrative proceeding of the CSC, it would appear that it needs to be completely revamped.[1] No employee of the government should be subjected to the treatment this plaintiff received. The following phrase is pertinent:

> If however, the Commission is sustained in this case, and, accordingly behaves similarly in future cases, then its conduct will indeed be a mystery. Its so-called * * * ["determinations"] will then be acceptable, no matter how contrived. In that event, it would be desirable to abandon the word * * * ["determination"]— since that word misleadingly connotes some moderately rational judgment— and to substitute some neutral term, devoid of misleading associations, such as * * * "woosh-woosh." The pertinent doctrine would then be this: "When the * * * [CSC] has ceremonially woosh-wooshed, judicial scrutiny is barred." * * * Old Colony Bondholders v. N. Y., N. H. & H. R. Co., 161 F.2d 413, 450 (2d Cir.1947) (Frank, J. dissenting opinion), cert. denied, 331 U.S. 859, 67 S.Ct. 1755, 91 L.Ed. 1866.

In my opinion, the decision of the CSC that plaintiff was totally disabled from performing the duties of her position was arbitrary and capricious and was not supported by substantial evidence and was an unconscionable abuse of executive discretion. We have held that a court can set aside the Commission's (CSC) determination or refuse to recognize it as valid where there has been a substantial departure from important procedural rights, a misconstruction of the governing legislation, or some like error "'going to the heart of the administrative determination.'" See Gaines v. United States, supra. I think these principles apply here, and that the required error is abundantly shown.

In response to Judge Nichols' concurring opinion, it is readily apparent that much of it is based on alleged facts that are outside the evidence and are, in

---

1. This opinion was prepared prior to the promulgation by the CSC of its new disability retirement regulations to be effective July 1, 1968. See 33 F.Reg. 7715–17 (May 25, 1968).

some instances, speculation, a partial list of which follows:

1. A letter sent by the Air Force to the CSC requesting plaintiff's involuntary retirement, which while listing enclosures which are not now attached, is presumed to have included "an account of plaintiff's behavior on the job." (Not in evidence.)

2. That plaintiff requested permission to consult a Dr. J. P. Hilton of Denver who furnished a diagnosis of schizophrenic reaction, paranoid in type, in a letter marked "Personal and Confidential" to a Dr. Albers of the Finance Center. (Not in evidence.)

3. That the CSC would have acted on the alleged Hilton diagnosis alone "and sought another only after it became apparent that plaintiff had retained counsel, and there was going to be litigation in all probability unless they backed down." (Not in evidence and speculation.)

4. The use of the Hilton diagnosis might have exposed him to the charge that he had violated his Aesculapian oath causing professional embarrassment. (Speculation.)

5. The statement that it seems obvious that the mysterious conclusion is a clerical error "such as might occur in any large office where statements have to be typed repetitively on numerous documents." (Speculation.)

6. The plaintiff sued in the state courts all the Denver doctors who had any connection with her retirement, including a Dr. Hilton and Dr. Overholt. (Not in evidence.)

7. The alleged ethics of doctors not to give court testimony, although truthful, that will assist the prosecution of a law suit against another doctor. (Not in evidence and speculation.)

8. That Dr. Tish testified in such a manner as to protect the other doctors whom plaintiff had sued. (Not in evidence and speculation.)

Indeed, the concurring opinion admits that much of the above alleged evidence relied upon was either offered and excluded by the commissioner, or else was not even offered.

Most of these alleged facts are hearsay. Yet they constitute the foundation for the concurring opinion. To require the plaintiff to overcome suppositions and allegations like these, would be a heavy, unfair, and improper burden indeed for her to bear. I do not believe that we are empowered to indulge in such speculations. We do not make the facts, but take them as we find them. As John Adams said when reminding a jury of their responsibility to the facts:

Facts are stubborn things; and whatever may be our wishes, our inclinations, or the dictates of our passions, they cannot alter the state of facts and evidence * * *. Williamson, John Adams, Counsellor of Courage, 54 A.B.A.J. 148, 150 (1968).

The concurring opinion says that Dr. Tish's testimony "got off into fantasy," and points out its "inability to believe anything Dr. Tish said * * *." Yet, that opinion, which discredits Dr. Tish as a witness, would, in effect, shelter his unbelievable testimony under the alleged shield of professional loyalty. In effect, the concurring opinion agrees with me that Dr. Tish's testimony should not be considered in this case. For reasons which follow, the plaintiff would easily prevail if the evidence of Dr. Tish is excluded.

Two medical officers in the Disability Retirement Section must concur in deciding a case of involuntary retirement after each doctor separately reviews the record. Dr. Tish testified that he and a Dr. Mercer were the two doctors who made the review and approved the application to retire plaintiff as being totally disabled. Dr. Mercer did not testify at the trial. So, if you take Dr. Tish out of the case as suggested, the retirement of plaintiff is illegal, because you do not have any evidence that two doctors reviewed the case as required by the rules. In fact, you do not have evidence that a single doctor in the section

reviewed the case, because Dr. Mercer would be out of the case too, since the only proof of what he did was what Dr. Tish testified to, as Dr. Mercer did not appear.

Furthermore, when plaintiff appealed, her appeal was submitted to Dr. Tish for further review "pursuant to the usual procedure." Dr. Tish "reviewed Dr. Tish" and refused to change his prior decision. If Dr. Tish is out of the case, this procedure is violated and there would be no proper review of plaintiff's appeal.

Without Dr. Tish, there would be no interpretation of Dr. Overholt's diagnosis of plaintiff, nor any definition of the meaning of the word "competent" in the diagnosis. We would be free to define it in the popular sense as meaning the plaintiff was "able" (as distinguished from disabled), as I indicated is the correct meaning of the word.

The government had no case even with Dr. Tish participating, but when you take him out, the government is left destitute, as he made all of the vital decisions in the case against the plaintiff.

In some respects, the Overholt diagnosis is favorable to plaintiff, and certainly does not indicate directly, indirectly, or by innuendo that plaintiff is totally disabled. In any event, it was not considered as being material to the case.

So, with Dr. Tish being out of the case, and with Dr. Overholt's report showing nothing to indicate plaintiff was totally disabled, and with Dr. Masten finding that the only thing wrong with the plaintiff was halitosis, I reach the inescapable conclusion that there was not only no substantial evidence to support the decision of the CSC, but no evidence at all.

It is my view that this court, with the reputation it has, should not let the unsavory activities which occurred here go unnoticed. We should be as quick to strike down the unauthorized and arbitrary entries on the forms here as we were to condemn the forgeries of the documents in the *Hankins* case, supra, or in any other case where they occur. Otherwise, we do not uphold the tradition of this court and justice does indeed become a "blind lady."

Finally, I must comment briefly on the inapplicability of the V.A. General Rating Formula in the *Davis* case, supra, referred to in the concurring opinion. The opinion fails to disclose that such ratings are in a code that applies only to military personnel and has no bearing on civilian personnel cases. There is no code, rating, standard or regulation whatever governing mental disability cases involving civilian personnel within the jurisdiction of the CSC. Civilian employes are either able to do their work or else they are totally disabled from doing so. It is everything or nothing. There is no sliding scale or in between status. Furthermore, if the code could be considered, any analogy is incomplete without mentioning all factors in the diagnosis. Only "severe impairment" is mentioned in the concurring opinion, while plaintiff's diagnosis included, among other things, "in partial remission." If the concurring opinion insists on discussing the military rating formula, it should mention that remission factors can affect the individual's disability rating significantly. For instance, in the code, full remission on a scale of 100 percent means 0 percent disability. Partial remission, as in our case, could mean one percent disability or ten percent disability, or any other percent less than total disability. Anything less than total disability under the CSC system entitles plaintiff to retain her job. There was no evidence that she was totally disabled.

Accordingly, I would enter judgment for the plaintiff as prayed for in her petition, and would remand the case to the commissioner to determine the amount of recovery under Rule 47(c) (2).

DURFEE, Judge, joins in the foregoing dissenting opinion.